896 F.Supp. 1427 (1995)
MEMORIAL HOSPITAL, INC., et al., Plaintiffs,
v.
Masten CHILDERS II, sued in his official capacity as Secretary, Cabinet for Human Resources, Defendant.
C.A. No. C93-566-L(H).
United States District Court, W.D. Kentucky.
August 21, 1995.
*1428 *1429 Stephen Richie Price, Grover C. Potts, Jr., Edgar A. Zingman, Wyatt, Tarrant & Combs, Louisville, KY, for plaintiffs.
Philip J. Edwards, Angela M. Ford, Cabinet for Human Resources, Frankfort, KY, S. William Livingston, Jr., Vickie J. Larson, Covington & Burling, Washington, DC, for defendant.

MEMORANDUM OPINION
HEYBURN, District Judge.
Twenty-six hospitals that participate in the Kentucky Medical Assistance Program ("KMAP"), the State's Medicaid Program, now seek to invalidate Kentucky's payment program for inpatient medical services. Plaintiffs contend that the State of Kentucky failed to make the appropriate findings and assurances required by the Boren Amendment prior to devising its payment system. Plaintiffs further assert that the payment system itself is invalid because it neither reimburses the costs of efficiently and economically operated facilities nor does it properly "take into account" the special needs of hospitals servicing a disproportionate share of Medicaid patients. Specifically, Plaintiffs contest that KMAP is invalid in (1) its calculation and payment of per diem rates, (2) its usage of a peer group methodology, (3) its usage of a median cost index, (4) its usage of a rate of increase control mechanism, (5) its capital expenditure occupancy limitations, and (6) its failure to "take into account" those hospitals which treat a disproportionate share of Medicaid patients.
Both parties presented witnesses and argument in a court trial on June 12-14 and June 21, 1995. The Court has had the benefit of outstanding trial briefs as well as closing argument heard on August 8, 1995. Although several courts have confronted issues similar to those present in this case, the Sixth Circuit has heard only one. See In re Madeline Marie Nursing Homes, 694 F.2d 433 (6th Cir.1982) (concerning the appropriate standard of judicial review). Consequently, the Court must look to other decisions, as well as detailed analyses of both the procedural and substantive components of the Kentucky Medical Assistance Program. The Court concludes that KMAP does not violate the Boren Amendment.

*1430 I.

OVERVIEW OF MEDICAID AND THE BOREN AMENDMENT
Pursuant to the Medicaid Act, Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq. (the "Act") the federal government is authorized to reimburse states who provide medical assistance to eligible low income persons. The Act intended to provide a nationwide program of medical assistance to low income families and individuals. Participation in the Medicaid program is voluntary; however, if a state elects to participate, the state must comply with all federal statutory and regulatory mandates. To qualify for the federal financial support, a participating state must first submit a "State Plan" for approval by the Health Care Financing Administration of the Department of Health and Human Services (hereinafter "HCFA"). 42 U.S.C. § 1396a(a).[1]
Prior to 1981, states paid hospitals the actual costs incurred when providing care to Medicaid recipients, regardless of disparities in costs or efficiencies among the participating hospitals. In 1981 Congress promulgated the Boren Amendment, 42 U.S.C. § 1396a(a)(13)(A), which altered this payment methodology. Id. Specifically, the Boren Amendment provides that hospitals are to receive Medicaid rates:
[w]hich the State finds, and makes assurances satisfactory to [HCFA], are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards and to assure that individuals eligible for medical assistance have reasonable access ... to inpatient hospital services of adequate quality ... (emphasis added)
Id. With respect to hospitals, the statute also requires that payment rates "take into account the situation of hospitals which serve a disproportionate number of low income patients with special needs." Id.; see also 42 U.S.C. § 1396r-4.
The Boren Amendment also establishes that when a participating state submits either a "State Plan" or a "State Plan Amendment" to the HCFA, the state must also submit certain assurances supported by findings. See 42 C.F.R. § 447.253(b). Specifically, HCFA regulations require that:
[w]henever the [State] Medicaid agency makes a change in its methods and standards, but not less often than annually, the [State] agency must make the following findings:
(1) Payment Rates. (1) The Medicaid agency pays for inpatient hospital services and long-term care facility services through the use of rates that are reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated providers to provide services in conformity with applicable State and Federal laws, regulations, and quality and safety standards. (emphasis added)
42 C.F.R. § 447.253(b). A state, however, is not required to submit its actual findings to HCFA. Id.
The HCFA also requires participating states to demonstrate that its Medicaid payment rates will not exceed specified upper payment limits. 42 C.F.R. § 447.253(b)(2). Indeed, the evident congressional purpose present throughout the Medicaid Act and the Boren Amendment is to allow states the freedom to experiment with different reimbursement schemes reasonably calculated to fairly compensate hospitals under the Boren criteria and to achieve monetary savings. Plaintiffs contend that Kentucky's system fails to meet the criteria set forth by the Boren Amendment.

II.

KENTUCKY MEDICAL ASSISTANCE PROGRAM
KMAP is administered by the Kentucky Cabinet for Human Resources ("CHR"). The entire program also includes benefits paid to individuals beyond that required by *1431 federal statutes. There are 122 hospitals in Kentucky which participate; this number includes all but one of the hospitals in the state.
In general, KMAP provides for a facility specific per diem rate paid for each day of inpatient treatment to Medicaid and KMAP recipients. Facilities receive other payments based on specific facility characteristics. The payment rates are calculated annually and applied prospectively. See 907 KAR 1:013E.
Kentucky implemented a per diem methodology for reimbursing hospitals, which became effective March 1, 1982. The system has been modified in numerous respects since then, although the basic per diem methodology has remained the same. Hospitals receive a facility-specific per diem payment for every day of inpatient care provided to an eligible Medicaid patient. The purpose of the formula is to approximate the average per diem cost of treating a Medicaid patient (and not the hospital's average of all patients). The per diem rate for each hospital is the sum of three components: operating costs, capital costs, and professional costs. See 907 KAR 1:013E § 3.[2]
Operating costs account for approximately 90 percent of a hospital's total per diem payments. To determine this component, CHR takes the operating costs reported on the hospital's most recent Medicare cost report (HCFA-2552) and deducts certain expenses that it has determined to be nonallowable for Medicaid purposes.[3] These nonallowable costs include political contributions, legal fees from suits against the State where the State prevailed, and out-of-state travel costs. (The costs of education and training are not disallowed, even if incurred outside the state. Id. at 106.01(c).) This method of calculation produces each facility's Medicaid allowable costs. Operating costs are composed of two categories: routine costs and ancillary costs, of which the routine costs comprise approximately 60 percent. The routine portion of the costs is determined by dividing the total number of patient days at the hospital by the hospital's total administrative costs. Determining the ancillary costs is more Medicaid specific: all ancillary medical expenses for Medicaid patients are divided by the number of Medicaid days. The total of the routine and ancillary costs approximates the per diem Medicaid operating costs at a facility. These costs are then inflated to the beginning of the upcoming rate year (January 1) by using the hospital-specific inflation factor published annually by Data Resources, Inc. (known as the "DRI"). See 907 KAR 1:013E § 3(3).[4]
CHR applies two limits on the reimbursement of operating costs: a median based limit and a rate-of-increase control ("RIC"). The median-based limit is applied in the following manner. Hospitals are first grouped with other hospitals according to bed size and type of hospital (referred to as "peer grouping"). 907 KAR 1:013E § 3(5).[5] CHR then determines the median cost per diem *1432 for each peer group. See 907 KAR 1:013e § 3(8)(a). Within each peer group, the median per diem cost sets the limit on the reimbursement of operating costs, with the following exceptions: the limit for hospitals with 100 beds or less is established at 110 percent of the weighted median; the limit for certain hospitals with heavy Medicaid case load is established at 120 percent of the weighted median (126 percent for designated teaching hospitals and major pediatric hospitals); and the limit for psychiatric hospitals with high Medicaid utilization (35 percent or greater) is set at 115 percent of the median.
The second limitation, the RIC, limits allowable cost growth to not more than 150 percent of the DRI index in effect during the relevant time period. 907 KAR 1:013E § 3(8)(a)1.f. This limitation was implemented on July 1, 1993.[6]
The capital costs component of the reimbursement rate is calculated separately from the operating costs component. CHR first looks to the capital costs reported by the hospitals' most recent Medicare costs reports (HCFA-2552). Such capital costs include interest and depreciation related to hospital buildings and equipment. 907 KAR 1:013E § 3(6). The portion of these costs attributable to the Medicaid program is then subject to the following adjustments.
In 1986, the amount deemed allowable under the Medicaid program for depreciation on buildings and fixtures was first limited to 65 percent of the reported depreciation amount. Id. § 3(7). This reduction is not applied to major movable equipment or to psychiatric hospitals. 907 KAR 1:013E § 3(7).
Next, a minimum occupancy factor is applied when calculating a hospital's capital costs per patient day. 907 KAR 1:013E § 3(6). A hospital's total capital costs are divided either by the actual patient days at the hospital or by the number of patient days that the hospital would have had if its average occupancy equaled the occupancy factor, whichever is higher. A 60 percent occupancy factor applies to hospitals with 100 or fewer beds, while a 75 percent occupancy factor applies to hospitals with 101 or more beds. Id. Finally, capital costs, like operating costs, are subject to the RIC. Thus, KMAP does not allow recognition of capital cost growth in excess of 150 percent of the DRI. See 907 KAR 1:013E § 3(8)(a)1.f.
As part of its Medicaid per diem program, Kentucky makes additional payments to the State's pediatric teaching hospitals and to those hospitals which treat a disproportionate share of Medicaid patients ("DSH hospitals or payments"). The adjustment made to Kentucky's pediatric teaching hospitals (University Hospital and U.K. Medical Center), called the Operating Intensity Allowance, is an addition to the facility's base rate. Pediatric teaching hospitals have an upper limit set at 126% of the weighted median per diem cost for all other hospitals of comparable size (401 beds and up). The pediatric teaching hospitals are paid in addition to the base rate an amount that is equal to 2% of the base for each 1% of Medicaid occupancy. This amount cannot exceed the prospective reasonably determined uncompensated Medicaid cost to the facility. Furthermore, pediatric teaching hospitals providing services to infants under age six and to a disproportionate share of Medicaid patients must be reimbursed appropriately.
CHR also uses several methods to provide extra payments to hospitals which treat a disproportionate share of Medicaid patients. First, as previously described, the system allows for percentage add-ons to the median limits applied to DSH hospitals within each peer group, thus increasing the per diem rate for these hospitals.
Second, DSH hospitals receive additional payments at the per diem rate equal to the Medicaid rate for each day of care provided to indigent patients who are not covered by the Medicaid program. 907 KAR 1:013E § 3(9)(b). This includes overstay days of Medicaid patients and days for indigent patients not eligible for Medicaid. Finally, KMAP also provides for an additional payment of $200,000 to each Kentucky hospital with 100 beds or less. KMAP currently provides *1433 that the total of all these DSH payments may not exceed $81 million. 907 KAR 1:013E § 3(9).
Out-of-state hospitals participating in KMAP are also reimbursed for covered inpatient services provided to eligible Kentucky Medicaid recipients at the rate of 75 percent of their usual and customary charges (i.e., billed charges) up to the per diem upper limit for comparably sized hospitals in Kentucky. 907 KAR 1:013E § 4(1). An exception is made for certain "outlier" cases involving infants under age one and children under age six, in which case the hospital receives 85 percent of billed charges or up to 110 percent of the per diem upper limit for comparable sized Kentucky hospitals. Id. § 4(2). For out-of-state hospitals, the DSH adjustment is equal to one dollar per Medicaid day plus ten cents for each one percent of Medicaid occupancy above one standard deviation. 907 KAR 1:013E § 3(9).
Finally, KMAP provides for an administrative appeals procedure that allows health care providers an opportunity to request prompt administrative review of their payment rates and, in appropriate circumstances, to obtain upward rate adjustments. Through the appeals procedure, hospitals may seek an adjustment to their rate in a number of circumstances, including changes in case mix, changes in services provided or "extraordinary circumstances" that are considered to be beyond a provider's control.

III.

PROCEDURAL COMPLIANCE
The Boren Amendment requires a state to "find[], and make [] assurances satisfactory to the Secretary," that its Medicaid payment rates are reasonable and adequate within the meaning of the statute. 42 U.S.C. § 1396a(a)(13)(A). The "finding" must be made whenever a state Medicaid agency seeks to change its methods and standards of reimbursement, but not less often than annually. See 42 C.F.R. § 447.253(b). Submission of assurances to the federal government is required whenever a state submits a state plan amendment that changes its payment methods and standards. Id. § 447.253(a).
The "finding" requirement was not intended to force the states to engage in a formalistic, onerous or technical exercise. Instead, the Boren Amendment proposed to "reduce potentially stifling and expensive federal oversight of state methodologies." West Virginia Univ. Hospitals v. Casey, 885 F.2d 11, 23 (3rd Cir.1989). To accomplish this, Congress gave the states wide latitude, to allow them to "experiment [] with Medicaid methodologies," Casey, 885 F.2d at 26, and to avoid overburdening them with cumbersome paperwork requirements. Massachusetts Fed'n of Nursing Homes v. Massachusetts, 772 F.Supp. 31, 40 (D.Mass.1991). Thus, states "are free to create their own methods of arriving at the required findings." Folden v. Washington State Dep't of Social and Health Services, 981 F.2d 1054, 1057 (9th Cir.1992); AMISUB (PSL), Inc. v. Colorado Dep't of Social Services, 879 F.2d 789, 796 (10th Cir.1989).
States are also not required to develop a separate definition or model of efficiently and economically operated facilities. See Folden, 981 F.2d at 1057-58; Lett v. Magnant, 965 F.2d 251, 253 (7th Cir.1992); New Jersey Ass'n of Health Care Facilities v. Gibbs, 838 F.Supp. 881, 897 (D.N.J.1993). "[N]o explicit definition is necessary" because "the State's methods and standards implicitly act as the State's definition of an efficiently and economically operated facility." 48 Fed.Reg. 56049 (Dec. 19, 1983). Thus, "the process of identification and determination [of efficient facilities and the cost they incur] may be accomplished through the terms of the state plan itself." Gibbs, 838 F.Supp. at 898; see Folden, 744 F.Supp. at 1533, aff'd, 981 F.2d at 1057-58.
The Court will not accord the "findings requirement" more importance than can be reasonably derived from a fair reading of the statute. To require more would result in an imposition of this Court's own procedural notions upon the State. Nevertheless, CHR must show that it has developed and analyzed a minimum quantum of evidence that will allow it to evaluate its own rate formula. *1434 In other words, CHR must at least make a pass at conducting an objective analysis of the data and its own rates. CHR must prove that it conducted an "objective analysis, evaluation, or some type of fact finding process to determine the effects of the rates on the level of care Medicaid patients receive." Abbeville General Hospital v. Ramsey, 3 F.3d 797, 805 (5th Cir.1993); see also Nebraska Health Care Ass'n v. Dunning, 778 F.2d 1291, 1294 (8th Cir.1985).
CHR's only substantial argument is that its findings are implicit in its rate system. However, courts allowing this approach have typically required that the rate-making process be supported by some objective analysis and not merely by a conceptual policy decision. Abbeville General Hosp., 3 F.3d at 806. The facts of this case tend to show that only the latter occurred. CHR did not conduct a bona-fide fact finding process. The Court refers to the testimony of the State's witness, Jed Fitzpatrick, to highlight this point. Mr. Fitzpatrick, the branch manager in the Policy Analysis and Eligibility Branch of the CHR's Department of Medicaid Services, testified that he was involved with CHR's preparation of findings and assurances. On cross-examination, Mr. Fitzpatrick admitted that no studies were conducted to analyze the limitations on reimbursement rates such as median peer groups and the RIC. Instead, the agency used a "reasoned judgment" approach by which it concluded, in Mr. Fitzpatrick's words, that "the system totally meets Boren requirements." Informed or reasoned judgment, as described in these circumstances, does not meet the standards set by the Boren Amendment. Although this Court hesitates to place too much emphasis on so vague a statutory requirement, the Court is quite certain that more is required than has been established here.
The Court does not place the entire onus of proof on Mr. Fitzpatrick's testimony  indeed, CHR has not submitted any analyses of bona fide fact-finding procedures. After presenting a constantly changing target for its findings throughout this litigation, Defendant has belatedly presented Exhibit 1 as its "Kentucky Hospital Findings" for the fiscal year July, 1994, through June, 1995. The only "findings" that are relevant are the CHR's current findings. Because it was presented in June, 1995, the most recent study cannot possibly be considered as findings for a year which is virtually completed.[7] The Eleventh Amendment bars retrospective monetary relief from the state. Connecticut Hospital Ass'n v. Weicker, 46 F.3d 211, 217 (2d Cir.1995).
The Court finds that CHR failed to meet its procedural requirements.

IV.

STANDARD OF REVIEW
Next, Plaintiffs ask the Court to review the entire Kentucky Medical Assistance Program as it applies to hospitals. The Court's conclusion that Defendant failed to meet its procedural obligations impacts the standard of that review. Generally, the standard of review is a deferential one. In re Madeline Marie Nursing Homes, 694 F.2d at 442. However, the deferential standard may not be completely appropriate in all circumstances. It stands to reason that if CHR fails to make adequate findings, there may be no reason to accord deference to the reasonableness and adequacy of its medical rates. At least one court has said that once it finds a procedural violation of the Boren Amendment, the burden of proof as to substantive compliance shifts to CHR. Multicare Medical Center v. Washington, 768 F.Supp. 1349, 1396 (W.D.Wash.1991). This view has not found broad acceptance.
The Court concludes that CHR is entitled now to little or no deference in consideration of KMAP's substance compliance with the Boren Amendment. CHR, therefore, cannot hide behind the "arbitrary and capricious" standard. However, the Court is not prepared to say whether this alters the burden of proof in some telling way. As a practical matter, each side presented evidence on the substantive issues confronting the Court. *1435 The decision here evolves from weighing the evidence presented by each side, not from the imposition of an artificial burden of proof on one side or another. The evidence as a whole determines whether CHR has achieved substantive compliance. The Court will review the quality and quantity of that evidence de novo without according undue deference to CHR's current conclusions, findings or existing plan.

V.

SUBSTANTIVE COMPLIANCE
To venture an opinion on KMAP's substantive compliance with the Boren Amendment the Court must navigate an uncertain course charted by as many policy considerations as by specific directions of the statute. The decisions of other courts confronting similar issues are heavily fact based and provide little precedential guidance. But at least the experience of others starts this Court's voyage in the right direction.
Therefore, the Court is mindful that one of the goals of the Boren Amendment is the "sharp containment of health delivery costs" Casey, 885 F.2d at 14, Charleston Memorial Hospital v. Conrad, 693 F.2d 324, 331 (4th Cir.1982). See generally Wisconsin Hospital Ass'n v. Reivitz, 733 F.2d 1226, 1227-28 (7th Cir.1984) (recounting the legislative history of the Boren Amendment). The Boren Amendment does not require states "to reimburse providers for costs they actually or even reasonably incur." Colorado Health Care Ass'n v. Colorado Dep't of Social Servs., 842 F.2d 1158, 1169 (10th Cir. 1988); Gibbs, 838 F.Supp. at 898; Lett, 965 F.2d at 256. Rates need not meet a precise target, but may fall "`within a range of what could be considered reasonable and adequate.'" Casey, 885 F.2d at 26 (quoting 48 Fed.Reg. 56046, 56049 (1983)). Thus, "rates required to meet a standard of reasonableness may fall within a zone of reasonableness." Wisconsin Hospital Ass'n, 733 F.2d at 1233. See Folden, 981 F.2d at 1057; Colorado Health Care Ass'n, 842 F.2d at 1167. Thus, the case is not decided by comparing the costs reimbursed here to the actual costs of a theoretically efficient hospital.
Instead, a court should focus upon the overall reimbursement plan and its objectives. A court may not avoid analysis of individual components of the state methodology. But the purpose and effect of stringent provisions in the methodology must be viewed in the overall context of more generous ones.
The Court reviews the Kentucky rate system de novo. In making this review, the Court considers the individual components of the system as well as their combined effect. The Court considers whether the purposes in each plan segment lawfully encourage efficiency and whether the overall plan does so; whether the results were more fair than arbitrary; and whether an objective analysis can demonstrate substantial compliance with the two principal Boren Amendment mandates. In conducting its analysis, the Court is acutely aware that there may be unfair or even arbitrary components of this system or any system.
The Court must analyze then whether the individual components of this system and the system as a whole meet valid and lawful criteria: Is the system reasonably calculated to reimburse necessary Medicaid expenses? Does it encourage and reward efficient and economical operation of hospitals? Does it reasonably encourage efficient operation or cost restraint, rather than arbitrarily or coercively lowering costs? Does the system fairly take care of hospitals which serve a disproportionate share of Medicaid patients? These are the tests that the KMAP must pass.

A. Per Diem Rate
The central component of the Kentucky system is the per diem rate paid to each hospital. This methodology is used in most states. It has the advantage of reimbursing hospitals directly for each day of expense, thus adjusting somewhat for the relative acuity levels which may differ among Medicaid patients from hospital to hospital. Plaintiffs focus their criticism upon the application of the per diem rate methodology.
Plaintiffs assert that it fairly reimburses hospitals for much less than its actual average costs by reducing those costs even below *1436 what is allowable under Medicare. To be sure, the per diem payment is only as fair as the cost basis upon which it is determined.
Kentucky is only required to reimburse hospitals for those expenses which might be reasonably incurred to treat Medicaid patients. The Court finds that Kentucky's per diem calculations make a reasonable effort at doing just that. In most cases, the expenses deducted below the Medicare allowable costs are minimal. In any event, the deductions are reasonable. For instance, CHR has used reasonable judgment in its decision to deduct the out-of-state travel and political contributions; these are obviously not necessary in the treatment of Medicaid patients. Moreover, by allowing hospitals to include all of their routine administrative costs as part of the formula to determine operating costs, the Kentucky system helps those hospitals which have additional administrative costs due to the high acuity level of their non-Medicaid patients or due to the multiplicity of services they may offer primarily to non-Medicaid patients. The ancillary charges for each hospital are determined directly from the charges attributable to its Medicaid patients. For CHR to adopt a system which does not pay for the high cost of treating acutely-ill patients (which are usually not Medicaid patients) is certainly a reasoned judgment. The Court finds that the per diem system is conceptually reasonable and is applied fairly.

B. Peer Group Methodology
The peer group methodology, a system used in many other state programs, is another central element of the Kentucky system. Plaintiffs criticize it for not sufficiently taking into account the acuity levels of various hospitals. Plaintiffs claim that CHR's method of peer grouping does not consider the differences in hospital costs that are ancillary to efficient and economical operations. The Court finds, however, that peer grouping by size, although perhaps unfair in isolated circumstances, is by no means flawed. Medicaid acuity levels do not vary much by size of the hospital because the patients in all the hospitals have much more consistent level of acuity among Medicaid patients than among their patients at large. However, comparisons also show that per diem expenses generally increase as the size of hospitals increase, which is yet another indication of the conceptual fairness of the system. In sum, peer grouping helps refine the system and make it fairer, even though it does not always create a perfect comparison. Many states use such a grouping system and Plaintiffs do not raise serious issue regarding its appropriateness.

C. Median Cost Analysis
Another central component of this system is the concept that the use of median cost within each peer group is a reasonable index and satisfactory measure of what constitutes an economic and efficient hospital. Plaintiffs vigorously assert that Defendant has no evidentiary or other statistical basis for making this assumption. Defendant must concede the median cost analysis is somewhat arbitrary. But, it is not without a rational basis. Moreover, the system has other adjustments which are designed to compensate individual hospitals for identifiable inequities.
The real issue is not the median  for regardless of the measurement, one would have to make a judgment or use a median to divide those hospitals which are believed to be efficient from those which are believed to be inefficient. Assuming that the peer group index and average per diem cost used are fair, it is certainly reasonable to postulate that those who operate above the index may be operating somewhat less efficiently than those who operate below it. After all, efficiency may be fairly measured in terms relative to a group rather than relative to an objective standard.
Moreover, CHR has made a convincing case that the use of average costs is the best overall determinative of efficiency. There are many measures which could be used to determine the efficiency of the hospital in any particular area. However, each of these measures of efficiency and all of them taken together have their impact on the bottom line costs which is required for the hospital to provide a particular service. Thus, in some ways the average cost system can be considered a combination of all of the efficiency indexes. While Defendant presented evidence suggesting the validity of the cost comparison method, Plaintiffs have not presented *1437 convincing enough evidence that comparing costs is unfair for any reason.

D. Occupancy as an Indicator of Efficiency
The cost formula is also influenced heavily by occupancy: as a hospital occupancy lowers, its per diem costs rise, thus potentially penalizing the hospital by throwing its costs above the peer group median or by increasing costs faster than the RIC. Plaintiffs would criticize the formula for precisely that reason. Among other things, they say that reliance upon the occupancy criteria penalizes circumstances rather than identifying efficiency.
No doubt some hospitals may be disadvantaged by dropping occupancy in the State's formula. Some hospitals may be penalized by factors beyond their control. But states should have the freedom to address systematic inefficiencies as well as facility specific inefficiencies. Thus, it is fair to encourage more economical use of all state medical facilities. Who can say that dropping occupancy and the hospital's failure to react to it are not legitimate measures of administrative efficiency? CHR has an interest and a right to encourage full and economical use of medical facilities. It has a right to expect that a hospital will react to lower occupancy by lowering its costs. CHR has a right and indeed a responsibility to pay reasonable but not larger rates for the cost of unnecessary overhead or the costs of excess beds. Moreover, CHR has a right to encourage more economical use of facilities so long as the incentives are reasonable. Thus, the occupancy factor is reasonable in calculating average costs.
It is certainly true that the economics of smaller rural hospitals are different than those of medium size and larger hospitals and that a facility may be unfairly penalized by serving a disproportionate number of Medicaid patients. In certain rural areas, CHR faces a quandary: how to support any hospital presence at all where population shifts and changes in treatment standards cause local hospitals to lose occupancy. The Kentucky system makes allowance for these circumstances by providing those particular hospitals a per diem reimbursement greater than the medium for its peer group.

E. Rate of Increase Control
Plaintiffs reserve their strongest objections for the rate of increase control ("RIC") mechanism which CHR installed in July, 1993. Plaintiffs argue strenuously that imposition of the RIC alone is so unreasonable as to violate the Boren Amendment. Plaintiffs complain that the RIC is arbitrary; that it does not take into account changes in the acuity level within the hospital; that it does not take into account the increased cost of technology; and that its actual effect is to reduce over time the amount of an individual hospital's per diem reimbursement far below its actual Medicaid costs. Moreover, Plaintiffs contend that even now, and more so in the future, the RIC will directly and unfairly limit all per diem reimbursements, even for hospitals with per diem costs well below its peer group median. These persuasive arguments require careful consideration.
The RIC was imposed because state officials observed Medicaid costs increasing at four to five times the industry inflation rate. The RIC was designed to encourage cost consciousness within industry averages. No one can deny that such an objective, fairly calculated, is legitimate. The DRI, a nationally-recognized index of inflation in medical costs, is frequently used for Medicaid rate-setting purposes. Can it be so unreasonable for the State to ask that a hospital could keep its costs in line with 150 percent of the DRI computed industry inflation rate? Plaintiffs answer this question "yes," because the DRI inflation rate, they say, is an inaccurate measure of overall hospital costs. They say that the DRI does not fairly account for the costs of higher acuity levels and the cost of new technology. But the evidence simply does not support this view.
For instance, though it is theoretically possible for a hospital's total acuity level to vary over time, it is unlikely that it would change dramatically in one year. It is even more unlikely for a hospital's Medicaid acuity level to change dramatically over one year.
Moreover, Defendant presented persuasive evidence that the DRI inflation rate may even overcompensate hospitals for total cost inflation, including changes in technology and *1438 changes in acuity levels. Defendant introduced the ProPAC index as a measure that accurately reflects overall hospital costs. It is calculated by the Prospective Payment Assessment Commission, which is composed of a group of scientists commissioned by the HCFA to develop an inflation index that accurately reflects changes in case mix, productivity, new technology and its effects, and practice patterns. The ProPAC index proposes to measure the actual inflation of medical cost, irrespective of origin. Generally, the ProPAC index is somewhat lower than that of DRI and is considerably lower than RIC. Plaintiffs have shown that their costs are increasing, but in the face of Defendant's compelling evidence they have not presented a reason for their cost increases that demonstrates unfairness in the RIC.
The RIC has existed for only two years. The formula may be revised in future years. Plaintiffs may have justifiable reason to fear the RIC's future impact: it is not inconceivable that at some future time the RIC could cause unlawful consequences; however, that time has not yet arrived. This Court need not predict the future and will not speculate when, if ever, a point of unlawfulness may arrive. The Court does conclude that the RIC is not unlawful per se or unreasonable, as currently applied.

F. Capital Expenditure Formula
Capital expenditures amount to only approximately 10 percent of the per diem costs reimbursed to hospitals. Nevertheless, Plaintiffs contend that several features of the reimbursement scheme contribute to the overall unreasonableness of the per diem rate.
First, Plaintiffs dispute that part of the formula which allows the hospitals to depreciate only 65 percent of the straight line depreciation charges. They contend that the 65 percent limitation prevents the hospitals from fully recovering their capital costs. Second, Plaintiffs contend that the occupancy limitations unfairly penalize those hospitals with low occupancy rates and again prevent the hospitals from fully recovering the costs of legitimate expenditures. From the hospitals' point of view, these complaints are legitimate. However, the criticisms overlook the fact that CHR is entitled to approach the reimbursement formula from a slightly different perspective.
Indeed, Kentucky allowed full recovery of depreciation until 1986. At the time of the change, CHR fully explained its reasons to HCFA. Regardless, the merits of the change as explained, and those which the Court finds, are acceptable. First, all interest expenses are fully deductible. Thus, even though the hospitals are allowed to use straight line depreciation, much lesser amounts of the capital expenditures are in fact being paid back in the early years if the capital expenditure had been financed. Thus, the hospitals are getting a certain benefit from an acceleration of the depreciation even on a straight line basis. The Court certainly can envision circumstances in which CHR's capital expense reimbursement is fair, or more than fair, and other circumstances in which it may slightly under reimburse the hospital. None of these circumstances make the formula so unreasonable as to be a violation of law.
The capital expenditure occupancy limitations are easier to confront. The Court sees no reason why hospitals with low occupancy rates should receive a greater amount of depreciation than those hospitals which are fully utilizing their facilities. That would be the result if CHR did not impose an occupancy limitation. It is reasonable for CHR to decide not to unduly subsidize the expenditure of capital funds by hospitals that have unfilled beds. To be sure, this formula penalizes hospitals with low occupancies which need to incur large capital expenditures to modernize or expand their operations to meet the competition. However, those hospitals will not be penalized for long if the capital expenditures result in increased occupancy. Again, the fact that some hospitals may be penalized under certain circumstances, does not make the formula unreasonable or unlawful.

G. Disproportionate Share Payments
No one seriously disputes the importance or validity of the intensity operating allowance which the State pays to the two pediatric teaching hospitals, University Hospital *1439 and University of Kentucky Medical Center. The Operating Intensity Allowance is important as part of the State's Medicaid reimbursement formula to assure that the State has a constant source of pediatric specialists who more than any other speciality group will treat Medicare patients, and to assure that the State has at least two hospitals which can treat the most difficult and specialized pediatric cases. Thus, conceptually, it is an important part of the Medicaid formula. What the parties do dispute is how the funds should be accounted for on the cost and reimbursement side.
The Court finds no basis in the evidence to add the Cost Incentive Allowance to the cost side as well as the receipt ledger, as Plaintiffs propose. All costs incurred by those hospitals to treat high risk pregnancies are already included in the Medicare cost reports. To add the CIA as costs, without any evidence the costs have been omitted, is a pure fiction.
The Boren Amendment also requires states to "take into account" those hospitals which treat a disproportionate share of Medicaid patients in any state reimbursement plan. Plaintiffs argue that Defendant has the same burden of compliance with respect to these payments as it does with Medicaid patients. However, the requirement that CHR "take into account" disproportionate share hospitals is certainly different than a more specific requirement that the State reimburse the costs of efficient and economically run hospital for Medicaid patients. Regardless, who could argue that CHR has not "taken into account" these hospitals based upon the plan which has been adopted? KMAP provides that cost bills will be paid the regular per diem rate for all Medicaid overstay days and all indigent patients not eligible for Medicaid. Further, it envisions payment of $200,000 to all DSH hospitals having 100 or fewer beds. For all of the reasons previously stated, this formula fairly "accounts for" the economic burdens of disproportionate share hospitals.

H. Summary
The Court has reviewed all of the methodologies for calculating the percentage of costs paid by Kentucky's reimbursement system. After finding the individual components generally to be fair, it should not be surprising that the Court finds the overall results to be reasonable. The parties actually agree on many of the fundamental concepts for quantifying the percentage of costs paid. However, ultimately the Court finds Defendant's figures more precise and, on several key points of dispute, more accurate. This is most tellingly with respect to Defendant's accounting of the Operating Intensity Allowance, as previously discussed.
The Court concludes that the Kentucky Medical Program reimburses Kentucky hospitals on average between 93 percent and 96 percent of its Medicare eligible costs. By any measure of Kentucky hospitals, this reimbursement is within a reasonable zone calculated to allow those efficient hospitals the ability to recoup their reasonable Medicaid related costs.
Plaintiffs argue that the raw numbers are misleading and that by according extra benefits to the two pediatric teaching hospitals and the smaller hospitals, the State has left those in the middle unfairly reimbursed. The assertion has some underlying credence. But, whatever the disparity of reimbursement between individual hospitals, it is by no means so significant that the overall system falls outside that zone of reasonableness. Moreover, the Court believes that the Administrative Appeals process is a legitimate and workable procedure for considering individual inequities. The evidence is that many Medicaid participant hospitals and providers have utilized the appeals process successfully. Therefore, the Court has no concern that it is a sham.
Plaintiffs' principal argument has a certain logic and appeal. Assuming for the moment that the Kentucky reimbursement formula defines an efficient and economical hospital, then how can it be that any of those hospitals so defined be denied their full cost recovery under the Boren Amendment? The answer is that neither the Boren Amendment nor any proof available to this Court define so precisely what are economical and efficient hospital costs. Neither the Boren Amendment's *1440 express language nor its intent require such a precise definition. The proof of reimbursements more than 93% of Medicaid costs is safely within any required zone of reasonableness. KMAP may not be equally fair to all hospitals, however, it does provide hospitals with substantial reimbursement of all reasonable Medicaid costs. To acknowledge that KMAP may produce some unfair results and that it may require belt tightening by some hospitals that claim to be efficient, does not, by any means, demonstrate that this Court must overturn it.

VI.

CONCLUSION
In the final analysis, Defendant's evidence viewed de novo convinces this Court that KMAP reimbursements fall within the range of reasonableness which the Boren Amendment allows. Plaintiffs have offered evidence of varying strength that parts of KMAP have some inherent unfairness. But they fail to show that plan as a whole is either unfair or contains incentives to create savings which are unlawful. Defendant's proof demonstrates otherwise. Plaintiffs do not offer a compelling case that Kentucky hospitals are so efficient that they should be immune from the force of such incentives. They do not offer convincing alternatives to demonstrate the inherent unfairness and illegality of KMAP. Significantly, there is no evidence that Kentucky's system of reimbursement has detrimentally affected the quality of medical care to Medicaid patients or their equal access to that care.
The Court will enter an order consistent with this Memorandum Opinion.

ORDER
The Court having considered the memoranda, evidence and argument of the parties, having issued a Memorandum Opinion and being otherwise sufficiently advised,
IT IS HEREBY ORDERED that judgment is entered in favor of Defendant and Plaintiffs' complaint is DISMISSED WITH PREJUDICE.
This is a final and appealable order.
NOTES
[1] A participating state must also submit a "State Plan Amendment" for approval by HCFA whenever the state desires to modify its existing Medicaid plan. Id.
[2] Plaintiffs do not contest the methodology for calculating the professional component, which involves a very small part of the reimbursement system, and which is essentially reimbursed on a pass-through basis.
[3] Medicare cost reporting standards exclude certain expenses which hospitals incur and which are otherwise recognized under generally accepted accounting principles ("GAAP"). Examples of expenses which are not allowable under Medicare cost reporting principles are advertising expenses, costs of operating gift shops, costs of operating coffee shops or cafeterias for the general public, interest costs of excessive/unnecessary borrowings, costs of providing televisions in patient's rooms, and excess costs associated with related-party transactions. Under Medicare principles, certain costs are allowable but must be reduced for cost recovery items (e.g., radiological film is an allowable cost but must be reported net of revenues received by the hospital for the recovery of silver from used film).
[4] The DRI index is a nationally recognized calculation that is frequently used for Medicaid rate-setting purposes. The DRI is also applied in order to account for inflation that occurs during the rate year. Id. § 3(4).
[5] Under the current plan, acute care hospitals are separated into the following groups: 0-50 beds, 51-100 beds, 101-200 beds, 201-400 beds, and 401 beds and up. Id. § 3(5)(a). Psychiatric hospitals are placed in their own peer group, and rehabilitation hospitals are exempted from peer groups altogether. Id. § 3(5)(d-e). State teaching hospitals are exempt from the 401 + peer group unless "the facility's primary characteristics are considered essentially the same as the peer group's." 907 KAR § 3(5)(b).
[6] Plaintiffs suggest that the RIC is calculated differently than it is set forth in the Kentucky Administrative Regulations. The Court will construe the provision as it is used in practice.
[7] However, the Court can consider these "Findings" in its evaluation as to the reasonableness of Defendant's reimbursement plan.