**DRAKE CENTER, INC., Appellant,**

**v.**

**OHIO DEPARTMENT OF HUMAN SERVICES, Appellee.**

[Cite as *Drake Ctr., Inc. v. Ohio Dept. of Human Serv.* (1998), 125 Ohio App.3d 678.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

Nos. 97API04–595, 97API05–678 and 97API05–679.

Decided March 24, 1998.

*Geoffrey E. Webster* and *Norman J. Frankowski II,* for appellant.

*Betty D. Montgomery,* Attorney General, *Peter E. DeMarco* and *Peggy Corn,* Assistant Attorneys General, for appellee.

DESHLER, Presiding Judge.

This is an appeal by plaintiff, Drake Center, Inc., from a judgment of the Ohio Court of Claims, finding in part that Ohio's system for establishing reimbursement rates under the Medicaid program did not violate applicable federal and state law provisions.

The Drake Center, located in Hamilton County, is a nonprofit health care organization, providing hospital and nursing facility services. Drake Center has three hundred thirty-six beds, including two hundred fifty-six skilled nursing beds, and the facility participates in the state's Medicaid assistance program. Defendant, the Ohio Department of Human Services ("ODHS"), is the designated state agency charged with administering the state Medicaid program. Pursuant to a "provider agreement" between ODHS and Drake Center, ODHS makes payments to the facility for residents eligible for services under the Medicaid assistance program.

On June 30, 1995, Drake Center filed a complaint for mandatory injunctive and declaratory relief and damages, challenging the medical reimbursement rates established by the state. Specifically, Drake Center alleged that it was an "efficient and economical" provider of care and services and that it had timely filed cost reports and other information with ODHS detailing costs incurred in caring for residents at its facility. It was averred that "[t]he current rate of reimbursement calculated for Plaintiff and paid by the Defendant is not reasonable and adequate to meet the Plaintiff's reasonable and necessary costs of delivering the services mandated by state and federal law." Drake Center further alleged that the state had a mandatory duty to calculate a prospective rate for Drake Center as a provider of "outlier" services pursuant to R.C. 5111.257 and Ohio Adm.Code 5101:3–3–25.

The matter was tried before a judge of the Ohio Court of Claims over a three-week period. On April 1, 1997, the Court of Claims rendered a decision, finding that the state plan did not violate the Boren Amendment. The Court of Claims further found that Drake Center was not an efficiently and economically operated facility and that the state's assessment tool adequately measured the service needs of long-term-care facilities, including Drake Center.

Drake Center subsequently filed a request for separate findings of fact and conclusions of law, as well as a motion for new trial. The Court of Claims denied the request for separate findings of fact and conclusions of law and overruled Drake Center's motion for new trial.

On appeal, Drake Center sets forth the following assignments of error for review:

"Assignment of Error No. 1

"The trial court erred as a matter of law in holding that ODHS complied with the Boren Amendment, 42 U.S.C. § 1396a(a)(13)(A) and its implementing regulations.

"Assignment of Error No. 2

"The trial court erred as a matter of law in holding that ODHS complied with R.C. § 5111.257 and the regulations promulgated thereunder.

"Assignment of Error No. 3

"The trial court erred as a matter of law in holding that ODHS did not violate the state and federal constitutional rights of Drake Center, Inc.

"Assignment of Error No. 4

"The trial court erred as a matter of law in.holding that ODHS did not breach the provider agreement to which it is a party with Drake Center, Inc.

"Assignment of Error No. 5

"The trial court erred as a matter of law in holding that Drake Center, Inc. was not entitled to judgment on its quasi–contractual and promissory estoppel claims.

"Assignment of Error No. 6

"The trial court erred as a matter of law in holding that Drake Center, Inc. was not entitled to judgment on its equitable claims.

"Assignment of Error No. 7

"The trial court erred as a matter of law when it failed to consider the rebuttal evidence of Drake.

"Assignment of Error No. 8

"The trial court [erred] as a matter of law when it failed to adopt findings of fact and conclusions of law at the request of plaintiff.

"Assignment of Error No. 9

"The trial court erred as a matter of law when it failed to grant Drake a new trial."

Medicaid is a cooperative federal-state program through which the federal government provides financial assistance to states so that they may furnish medical care to needy individuals. *Wilder v. Virginia Hosp. Assn.* (1990), 496 U.S. 498, 499–502, 110 S.Ct. 2510, 2513, 110 L.Ed.2d 455, 461–462, citing Section 1396, Title 42, U.S.Code. Although participation in the Medicaid program is voluntary, states that participate must comply with certain requirements imposed by the Medicaid Act ("Act") and regulations imposed by the Secretary of Health and Human Services. *Wilder, supra,* at 502, 110 S.Ct. at 2513, 110 L.Ed.2d at 462. Thus, to qualify for federal assistance, a state is required to submit to the

secretary and have approved a plan for medical assistance "to establish, among other things, a scheme for reimbursing health care providers for the medical services provided to needy individuals." *Id.*

When originally enacted in 1965, the Act required states to provide reimbursement of the "reasonable cost" of hospital services actually provided. *Id.* Thus, "providers were paid for their actual costs incurred, regardless of disparities in costs or efficiencies among providers." *Madrid Home for Aging v. Iowa Dept. of Human Serv.* (Iowa 1996), 557 N.W.2d 507, 511. However, "[t]his 'retrospective' process of payment proved over time to be inherently inflational and contained no incentives for efficient performance." *Id.*

In 1980, in response to these concerns, Congress enacted the Boren Amendment to the Social Security Act, which changed the standard for reimbursement of nursing and intermediate care facilities. *Id.* The Boren Amendment provides that a state plan for medical assistance must:

"[P]rovide * * * for payment * * * of the hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded provided under the plan through the use of rates (determined in accordance with methods and standards developed by the State * * *) which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards and to assure that individuals eligible for medical assistance have reasonable access * * * to inpatient hospital services of adequate quality * * *." Section 1396a(a)(13)(A), Title 42, U.S.Code.

In considering the above language of the Boren Amendment, the United States Supreme Court in *Wilder* noted that "[t]he Act does not define these terms, and the Secretary has declined to adopt a national definition, concluding that States should determine the factors to be considered in determining what rates are 'reasonable and adequate' to meet the costs of 'efficiently and economically operated facilit[ies].' " *Wilder, supra,* 496 U.S. at 507, 110 S.Ct. at 2516, 110 L.Ed.2d at 465.

Thus, the Boren Amendment was enacted with the purpose of giving states "greater flexibility in calculating reasonable costs and in containing the continuing escalation of those costs." *Folden v. Washington State Dept. of Social & Health Serv.* (C.A.9, 1992), 981 F.2d 1054, 1056. Further, "[t]he Boren Amendment allows the states to adopt a 'prospective' rate-setting system, which sets out a predetermined rate that the provider will receive and, thus, encourages the provider to meet that rate or to absorb the loss if the provider's actual costs exceed that rate." *Id.*

In July 1993, Ohio implemented a reimbursement plan that utilizes a "prospective case-mix system." Ohio's method for establishing the total prospective rate for nursing facilities takes into consideration a combination of allowable per diems established for direct-care costs, "other protected" costs, indirect-care costs, and capital costs. Ohio Adm.Code 5101:3-3-43(A).

Under the state's case-mix reimbursement system, payment for direct services is adjusted "by identifying resident characteristics associated with actual measured resource use," taking into account the fact that "some residents are more costly to care for than others due to their different care needs." Ohio Adm.Code 5101:3-3-40. The direct-care cost component of the system is established through a methodology for grouping residents under the designation of "resource utilization groups, version III" ("RUGs III"), developed through the United States Health Care Financing Administration ("HCFA") multistate nursing home case-mix and quality demonstration project. Ohio Adm.Code 5101:3-3-41(B).

RUGs III is composed of seven categories of resident types (extensive services, special rehabilitation, special care, clinically complex, impaired cognition, behavior problems, and reduced physical functioning) from which forty-four RUGs III groups are classified. Ohio Adm.Code 5101:3-3-41(B). The RUGs III categories are "listed in descending order of hierarchy." *Id.*

The forty-four different groups under RUGs III are based on patient characteristics. Ohio Adm.Code 5101:3-3-41(F). A patient's classification into a resource utilization group is accomplished through the "minimum data set plus" (hereafter "MDS +"), a "core set of items that makes up the resident assessment instrument selected by Ohio." Ohio Adm.Code 5101:3-3-40(A)(12). All MDS + data elements related to the RUGs III classification system must be completed before a resident can be classified. Each of the forty-four RUGs groups is assigned a "relative resource weight," which indicates the relative amount of time and cost to deliver care to residents in that RUGs III group. Ohio Adm.Code 5101:3-3-41(I). MDS + is completed on a quarterly basis.

ODHS processes the resident assessment data submitted by nursing facilities and classifies residents using the RUGs III system to determine resident case-mix scores based on the relative resource weights. Ohio Adm.Code 5101:3-3-42(B). A facility's rate for direct-care costs is based on the facility's cost per case-mix unit. Ohio Adm.Code 5101:3-3-44.

The Ohio system also classifies nursing facilities according to "peer groups." Under the method for establishing the direct-care cost component, peer groups are based upon the geographic location of the county in which the facility resides. Ohio Adm.Code 5101:3-3-44(F). Under the method for establishing the indirect-care cost component, peer groups are based upon bed count, *i.e.*, facilities that

have less than one hundred beds and facilities that have one hundred beds or more. Ohio Adm.Code 5101:3-3-50(D)(1).

In *Ohio Academy of Nursing Homes, Inc. v. Barry* (1990), 56 Ohio St.3d 120, 129, 564 N.E.2d 686, 694, the Ohio Supreme Court noted:

" '[A] Medicaid reimbursement plan results from legislative and policy decisions made at both the Federal and State levels and that judicial review is both limited and "highly deferential," presuming agency action to be valid, and refraining from substituting the Court's own judgment for that of the agencies. * * * ' *Pinnacle Nursing Home v. Axelrod* (W.D.N.Y.1989), 719 F.Supp. 1173, 1181. Moreover, as noted by the court in *Pinnacle Nursing Home, supra*, at 1181, '[i]n reviewing non-adjudicatory Federal agency action, the Court is limited to deciding whether the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accord with law." *Citizens to Preserve Overton Park, Inc. v. Volpe* [1971], 401 U.S. 402 [91 S.Ct. 814, 28 L.Ed.2d 136]. In addition, since Federal law gives each state great latitude in dispensing its available funds, the same standard of review afforded the action of a Federal agency applies as well to actions of a state agency in administering a Medicaid plan." (Citations omitted.)

At the outset, we note that Drake Center concedes that, throughout the proceedings before the Court of Claims, it did not attempt to challenge Ohio's rate reimbursement system as a whole. Rather, Drake Center asserts that at trial it successfully "impugn[ed] * * * the action of ODHS in implementing the rate reimbursement system as to Drake." More specifically, Drake Center contends that it is an efficiently and economically operated facility, and "the fact that the costs of Drake were not paid by ODHS means that the reimbursement paid by ODHS was not reasonable and adequate to meet Drake's costs." Thus, Drake Center argues, "ODHS committed a substantive violation of the Boren Amendment."

We find Drake Center's contention that it is entitled to be reimbursed for its reasonable costs actually incurred, unless it is inefficiently or uneconomically operated, to be based on an incorrect analysis of the law. In support of its position, Drake Center cites *Regents of Univ. of California v. Heckler* (C.A.9, 1985), 756 F.2d 1387, superseded in (C.A.9, 1985), 771 F.2d 1182. The *Heckler* case, however, involved a challenge under the *Medicare* program and its statutory framework, Section 1395, Title 42, U.S.Code, wherein the term "reasonable cost" was defined as the " 'cost actually incurred * * * in the efficient delivery of needed health services.' " *Heckler, supra*, at 1389, quoting Section 1389x(v)(1)(A), Title 42, U.S.Code. The reasonable-cost standard at issue in *Heckler* has no application to the instant case. See, *e.g., Friedman v. Perales* (S.D.N.Y.1987), 668 F.Supp. 216, 224, fn. 10 (in case involving challenge to state's

Medicaid reimbursement rate, the court "strongly questions counsel's unfortunate and misleading reliance on *Regents* * * * 756 F.2d 1387 * * * for the argument that a providing facility is entitled to be reimbursed for its reasonable cost * * *. That case involved the reasonable cost standard which still applies to Medicare payments rather than the efficient cost standard which now applies to Medicaid").

■ Contrary to Drake Center's contention, under the current Medicaid reimbursement standard, a state is not required to reimburse every efficient and economic facility for its reasonable, actual costs. *Lett v. Magnant* (C.A.7 1992), 965 F.2d 251, 256. In *Lett,* the court noted:

"[T]he term 'reasonable' under the Boren Amendment embraces the notion that a state must reasonably *categorize* its rates. See, *e.g.,* [*Wisconsin Hosp. Assn. v.*] *Reivitz* (7th Cir.1984), 733 F.2d [1226] at 1233. As the Third Circuit has observed,

" 'It follows from the departure from a cost-driven reimbursement standard that a state's plan does not violate the substantive provision of the reasonable and adequate requirement simply because it fails to reimburse one efficiently operated [facility] its actual costs. What matters, rather, * * * is whether the reimbursement rates * * * in the aggregate are arbitrary and capricious.'

"*West Virginia Univ. Hosps. Inc. v. Casey,* 885 F.2d 11, 26 (3d Cir.1989) *aff'd on other grounds,* 499 U.S. 83, 111 S.Ct. 1138, 113 L.Ed.2d 68. Indeed, it is noteworthy that the 1981 OBRA drafters 'contemplated that the rates fixed in compliance with its provisions might not be sufficient to keep *every* hospital participating in the Medicaid program.' *Mary Washington Hosp.,* 635 F.Supp. at 899–900." (Emphasis *sic.*) *Lett, supra,* 965 F.2d at 257.

Thus, courts interpreting the provisions of the Boren Amendment have held that "a state's Medicaid payment must fall within 'a zone or range of reasonableness.' " *Madrid Home for Aging, supra,* 557 N.W.2d at 512, quoting *Kansas Health Care Assn. v. Kansas Dept. of Social & Rehabilitation Serv.* (C.A.10, 1994), 31 F.3d 1536, 1539. See, also, *Colorado Health Care Assn. v. Colorado Dept. of Social Serv.* (C.A.10, 1988), 842 F.2d 1158, 1169 (Boren Amendment does not require states "to reimburse providers for costs they actually or even reasonably incur").

■ Further, a state is not required to establish a model of an economically operated facility; rather, "the reimbursement costs are to be those that meet the standards of efficiently and economically operated facilities." *Folden, supra,* 981 F.2d at 1057. Accordingly, "states are left considerable latitude in how to determine what the costs are that 'must be incurred by efficiently and economically operated facilities.' " *Id.* Moreover, "HCFA has specifically rejected the suggestion that states should be required to define efficient and economically

operated facilities, because 'the State's methods and standards implicitly act as the State's definition.' " *Lett, supra,* 965 F.2d at 253. Therefore, "[c]ourts evaluating reimbursement rates have required only that the rates appear to be reasonable." *Portland Residence, Inc. v. Steffen* (C.A.8, 1994), 34 F.3d 669, 674.

In the present case, Drake Center did not present evidence indicating that the state's reimbursement system produces rates that are not reasonable and adequate in the aggregate. In fact, witnesses presented by Drake Center acknowledged that they had not even performed an analysis of whether the state's reimbursement system was in violation of the Boren Amendment. Specifically, Drake Center's expert witness Thomas Jazwiecki, while opining that Drake Center was an efficient and economical provider of services, acknowledged that he had not been asked to do a Boren analysis, nor did he have an opinion whether Ohio's reimbursement plan was in compliance with the Boren Amendment. Similarly, Drake Center's expert witness, David L. Jackson, testified that he "wasn't asked to do a Boren analysis, and * * * I would have declined to have done a Boren analysis."

Evidence regarding how the state identifies efficiently and economically operated facilities was provided in part by Robert Tornow, chief of the planning and research section of ODHS. Tornow testified that the state identifies efficiently and economically operated facilities based upon a calculation that initially breaks down direct and indirect costs. Tornow explained the calculation as follows:

"We calculate the direct care component, and that calculation takes the direct care costs and then divides [them] by inpatient days to get a per diem, and that per diem is then guided by the annual case mix score to get a cost per case mix unit for each facility.

"And then the cost per case mix unit then is arrayed in ascending order to determine the 25th percentile. And then at the 25th percentile, we then multiply it by 1.05 percent to get a benchmark, and then * * * the facilities that are under that benchmark are determined E and E at that point in time. And then we do the same calculation for the indirect care cost center. And then if both calculations show that the provider is under that benchmark ceiling, then that's determined E and E at that point."

Tornow termed the methodology "the 25th percentile plus 5 percent," and he stated that an economically and efficiently operated facility is defined as a provider that operates below the cost ceilings. Tornow stated that the "5 percent add-on * * * gives everyone the opportunity to become economically, efficiently operated in that calculation."

According to Tornow, approximately twenty percent of facilities are determined to be economically and efficiently operated providers each year under the

calculation. He noted, however, that this determination does not mean that only twenty percent of facilities receive full reimbursement (*i.e.*, one hundred percent) of their costs under Ohio's system. Rather, under the state plan over fifty percent of providers are reimbursed for one hundred percent of their costs. For instance, in 1994, fifty-two percent of facilities in the state were reimbursed one hundred percent of their costs.

Tornow further testified that, at the end of a calendar year, the state performs a calculation of the rate-to-cost coverage to ensure that the reimbursement system is adequately paying providers. Tornow defined rate-to-cost coverage as the ratio of a facilities' rate (*i.e.*, its reimbursement) compared to the facility's actual total costs in a given calendar year. Tornow stated that the aggregate rate-to-cost coverage for facilities in the state was approximately 99.2 percent, whether or not such facilities were determined to be economical and efficient operators.

Barbara Manard, an employee of Lewin–VHI, Inc., also testified regarding the state's aggregate rate-to-cost coverage. ODHS commissioned Lewin to study the state's reimbursement system, and Manard participated in preparing a report, admitted at trial as ODHS Exhibit No. KK, which analyzed the Medicaid rates paid to Ohio nursing facilities. The Lewin study found that the state's aggregate rate-to-cost average in 1993 was 99.4 percent, and that 54.1 percent of all nursing facilities had allowed rate-to-cost coverage of one hundred percent or more. The Lewin study concluded that such coverage "is strong evidence that the ODHS system recognizes the costs incurred by NFs and reimburses these costs in a reasonable and adequate way."

Todd Menenberg, a certified public accountant for a national consulting firm, testified that the statewide aggregate rate-to-cost coverage calculations for 1994 through 1996 (of approximately ninety-nine percent each year) "are extremely high numbers nationwide." Menenberg, who has testified in other states regarding reimbursement rates, noted that he was "not familiar with states that have percentages this high." Menenberg further stated that the fact that more than fifty percent of providers are being reimbursed one hundred percent of their costs indicates that costs are being equitably distributed. Menenberg opined that Ohio's reimbursement system pays reasonable and adequate rates to nursing facilities for the costs that must be incurred by economically efficient operators.

As indicated above, none of the experts presented by Drake Center performed a Boren analysis to determine whether Ohio's reimbursement rate was in substantial compliance with the Boren Amendment. We note, however, that Drake Center witness Thomas Jazwiecki acknowledged that, if fifty percent or more of facilities are reimbursed for one hundred percent of their costs, there is a

reasonable presumption that a state's rates are adequate under the Boren Amendment.

A number of courts in other jurisdictions have upheld state reimbursement plans as in compliance with the Boren Amendment in cases where the aggregate rate of reimbursement paid providers was less than that provided under Ohio's system. Under the facts of *Mem. Hosp., Inc. v. Childers* (W.D.Ky.1995), 896 F.Supp. 1427, Kentucky's medical assistance program for Medicaid reimbursement provided reimbursement to Kentucky hospitals on average between ninety-three percent and ninety-six percent of its Medicare eligible costs. In finding that the Kentucky program did not violate the Boren Amendment, the court in *Childers* held that "proof of reimbursements more than 93% of Medicaid costs is safely within any required zone of reasonableness." *Id.* at 1440. Similarly, in *New Jersey Assn. of Health Care Facilities v. Gibbs* (D.N.J.1993), 838 F.Supp. 881, 900, the court held that it was "reluctant to conclude that a reimbursement system that, under plaintiffs' own method of calculation, reimburses 86.3% of the industry's aggregate costs is outside the range of reasonableness, particularly when it is clear that Congress did not intend the Boren Amendment to require payment of all costs by a state."

In the present case, the Court of Claims, as trier of fact, assessed the evidence presented as well as the credibility of the expert witnesses and held that, "on an aggregate basis, Ohio's state plan complies with the Boren Amendment," *i.e.*, that rates set by ODHS and paid to providers "are within a zone of reasonableness." Upon review, this court concludes that the findings of the Court of Claims are supported by substantial evidence in the record.

While the Court of Claims further found that Drake Center was not an efficiently and economically operated facility, we deem it unnecessary to reach that issue. Even assuming that Drake Center's rates are inadequate, it has made no showing that Ohio's reimbursement system produces rates that are inadequate as to facilities in the aggregate. See *Portland Residence, supra*, 34 F.3d at 674.

We make clear that we do not hold that an individual provider lacks standing to challenge the state's system for reimbursement. In its reply brief, Drake Center cites *West Virginia Univ. Hospitals, Inc. v. Casey* (C.A.3, 1989), 885 F.2d 11, for the proposition that "the Third Circuit Court of Appeals affirmed the decision which held that Pennsylvania's prospective payment system as it applied to the plaintiff in that action violated the Boren Amendment."

In *Casey*, an out-of-state hospital brought an action against state officials alleging that the state's reimbursement program for out-of-state hospitals violated federal payment standards. However, while *Casey* involved an action by an individual provider, the court recognized that the issue was not whether the state's reimbursement rates were adequate as to a single provider, but rather

whether the rates were adequate in the aggregate. Specifically, the court in *Casey* held:

"It follows from the departure from a cost-driven reimbursement standard that a state's plan does not violate the substantive provision of the reasonable and adequate requirement simply because it fails to reimburse one efficiently operated hospital its actual costs. What matters, rather, * * * is whether the reimbursement rates to out-of-state hospitals in the aggregate are arbitrary and capricious." *Casey, supra,* 885 F.2d at 26.

Thus, the court in *Casey* reviewed the state's plan as a whole. *Id.* at 27. Drake Center's reliance on *Casey* does not support the proposition that the Court of Claims erred in the instant case in determining that, on an aggregate basis, the state's plan did not violate the Boren Amendment, as the reimbursement rates paid to providers fall within a zone of reasonableness.

■ Apart from the issue whether Ohio's system meets the substantive requirements of the Boren Amendment, Drake Center also contends that ODHS has failed to comply with procedural aspects of the Act. Specifically, Drake Center contends that Ohio's system fails to provide an appeals process as required by law. We disagree.

Section 447.253(e), Title 42, C.F.R. provides:

"Provider Appeals. The Medicaid agency must provide an appeals or exception procedure that allows individual providers an opportunity to submit additional evidence and receive prompt administrative review, with respect to such issues as the agency determines appropriate, of payment rates."

One federal court, in construing the above regulation, concluded that "the language of the federal regulation, in keeping with the federal policy to contain health costs and give states great flexibility in the administering of medicaid, reserves to the judgment of the states the decision whether to allow challenges to the validity of the methodology at the administrative level." *Casey, supra,* 885 F.2d at 31. The court further noted that "[i]mplicit in the regulation is, we believe, a requirement that at least correct calculation of the payment rate is a mandatory issue for appeal." *Id.*

Ohio has such a regulation. Ohio Adm.Code 5101:3-3-24(A) states that "[a] facility * * * may request a reconsideration of a prospective rate on the basis of a possible error in the calculation." Ohio also allows providers to apply for an increased rate on a one-time basis in instances where ODHS, "in its sole discretion, determines that the rate as calculated * * * works an extreme hardship on the facility." Ohio Adm.Code 5101:3-3-24(D). Further, Ohio allows providers to apply for reimbursement beyond the levels addressed under the RUGs III system in situations involving the provision of outlier services. Ohio

Adm.Code 5101:3–3–25. At trial, Drake Center's own witness, Thomas Jazwiecki, testified that Ohio's method for reimbursing outlier services complies with the federal requirement of an appeals or exception process. Specifically, Jazwiecki stated that "the federal standards require an appeal process. I think the general statutory framework for the Ohio outlier program meets those criteria." Drake Center's contention that the state system violates the federal requirement of an "appeals or exception process" is without merit.

Based upon the foregoing, the record fails to show that the state acted in an arbitrary or capricious manner in determining reimbursement rates to be paid to providers. Thus, the Court of Claims did not err in finding that the state plan did not violate the Boren Amendment.

Drake Center's first assignment of error is not well taken and is overruled.

 Under its second assignment of error, Drake Center asserts that the Court of Claims erred in holding that ODHS complied with R.C. 5111.257 and the regulations promulgated under that statute.

R.C. 5111.257 provides:

"(A) Notwithstanding sections 5111.23, 5111.231, 5111.235, 5111.24, 5111.241, 5111.25, 5111.251, and 5111.255 of the Revised Code, the department of human services shall adopt rules in accordance with Chapter 119. of the Revised Code that establish a methodology for calculating the prospective rates for direct care costs, other protected costs, indirect care costs, and capital costs that will be paid each fiscal year to nursing facilities and intermediate care facilities for the mentally retarded, and discrete units of nursing facilities or intermediate care facilities for the mentally retarded, that serve residents who have diagnoses or special care needs that require direct care resources that are not measured adequately by the applicable assessment instrument specified in rules adopted under section 5111.231 of the Revised Code, or who have diagnosis or special care needs specified in the rules as otherwise qualifying for consideration under this section. The facilities and units of facilities whose rates are established under this division may include, but shall not be limited to, any of the following:

"(1) In the case of nursing facilities, facilities and units of facilities that serve medically fragile pediatric residents, residents who are dependent on ventilators, or residents who have severe traumatic brain injury, end-stage Alzheimer's disease, or end-stage acquired immunodeficiency syndrome[.]

"* * * *

"(B) The department may adopt rules in accordance with Chapter 119. of the Revised Code under which the department, notwithstanding any other provision of sections 5111.20 to 5111.32 of the Revised Code, may adjust the rates

determined under sections 5111.23 to 5111.255 of the Revised Code for a facility that serves a resident who has a diagnosis or special care need that, in the rules adopted under division (A) of this section, would qualify a facility or unit of a facility to have its rate determined under that division, but who is not in such a unit."

Pursuant to the provisions of R.C. 5111.257, ODHS promulgated Ohio Adm. Code 5101:3–3–25, providing for a payment methodology for the provision of outlier services. Ohio Adm.Code 5101:3–3–25(B)(2) defines "outlier services" as follows:

" 'Outlier services' are those clusters of services which have been determined by ODHS to require staffing ratios, certain indirect costs, and capital investments beyond the levels otherwise addressed in rules 5101:3–3–43 and 5101:3–3–78 of the Administrative Code when delivered by qualified providers to individuals who have been prior authorized for the receipt of a category of service identified as an outlier service by ODHS and/or set forth as such in Chapter 5101:3–3 of the Administrative Code."

ODHS has currently promulgated rules recognizing outlier services for certain distinct part units involving pediatric and traumatic brain patients.[1] See Ohio Adm.Code 5101:3–3–541 (setting forth "conditions under which enhanced payment is available to distinct part units of nursing facilities [NFs] for the provision of authorized intensive rehabilitation services to individuals with severe maladaptive behaviors due to traumatic brain injury [NF–TBI services]") and Ohio Adm.Code 5101:3–3–545 (setting forth "conditions under which enhanced payment is available to distinct part units of medicaid certified nursing facilities [NFs] for the provision of prior authorized pediatric outlier care [NF–PED services]"). Further, as noted by the Court of Claims, Ohio Adm.Code 5101:3–3–25(D) permits facilities or distinct part units that were previously considered providers of outlier services to be grandfathered in as qualifying providers. Specifically, Ohio Adm.Code 5101:3–3–25(D) states:

"Those facilities or distinct part units that were qualified providers prior to July 1, 1993 and/or those that apply for an outlier provider agreement prior to or during the first quarter of state fiscal year 1994 and are determined eligible by ODHS shall receive rates established in accordance with this rule effective July 1,

---

1. At trial, ODHS employee Kim Irwin testified that the outlier rules promulgated for pediatric and traumatic brain injury patients involved a subpopulation of these patients. Specifically, she stated that the outlier rule for traumatic brain injury patients was designed for a subpopulation of patients who had "severe behavior challenges" and required a unique service, cognitive therapy, which is not accounted for on the MDS+ form or under RUGs III. Irwin testified that the outlier rule for pediatric patients was based in part on the fact that these patients required extensive ventilator, tracheostomy, and suctioning care.

1993 or the first day of the month in which outlier services were provided, whichever is later."

Regarding the issue of outlier services, Drake Center contends that the residents at its facility are "atypical with respect to all other facilities in the State of Ohio" and thus the population is not adequately measured by the applicable assessment instrument (RUGs III). Drake Center asserts that defendant had a duty, pursuant to statute, to promulgate regulations that would pay Drake Center in accordance with R.C. 5111.257.

■ At the outset, we agree with ODHS's contention that R.C. 5111.257 does not, in and of itself, mandate that the agency identify any particular facilities or units of facilities as providers of outlier services. The statute requires ODHS to adopt rules establishing a methodology for calculating reimbursement for facilities that serve residents whose diagnoses or special needs are "not measured adequately by the applicable assessment instrument." However, the statutory language "not measured adequately" is not defined, and we do not construe R.C. 5111.257 as creating a duty on the part of ODHS to recognize all facilities requesting rate reimbursement under the statute as qualified providers of outlier services. Rather, ODHS's rulemaking function under the statute involves the exercise of agency discretion in determining whether there are facilities that serve residents whose diagnoses or needs are not measured adequately by the applicable assessment instrument (and upon a finding that the instrument is not adequately measuring such needs, the agency then has a duty to adopt rules related to reimbursement). This discretion is evidenced by the use of permissive rather than mandatory language in the statute identifying specific facilities and units of facilities that "may" be determined to be eligible for reimbursement as providers of outlier services.

In the present case, the Court of Claims found, based on the evidence presented at trial, that Drake Center failed to prove that it serves residents with diagnoses or special care needs that are not adequately measured by the RUGs III assessment tool, or that ODHS acted in an arbitrary or capricious manner in exercising its discretion to decide what type of residents require outlier services. Upon review, we find that there was evidence to support the Court of Claims' determination.

At trial, Drake Center argued that the RUGs III system did not adequately measure the costs and resources necessary to care for the type of high acuity residents served by the facility. Drake Center's expert witness Thomas Jazwiecki, a former HCFA employee, opined that "Drake Center is a representative example of a type of facility in the state of Ohio that should be awarded outlier status." Among the reasons he cited were the high case mix at the facility and the facility's high cost structure. Jazwiecki also expressed concern that the peer

group designation for Drake Center did not appear to be representative of the facility. Jazwiecki opined that he saw nothing under Ohio's regulations regarding the payment methodology for providers of outlier services that would preclude Drake Center from being designated as such a provider. Jazwiecki acknowledged, however, that Ohio's regulations "do not mandate specifically that the Drake Center be identified as an outlier."

Another Drake Center expert witness, Dr. David Jackson, testified that the patient mix at Drake Center is "atypical in both intensity and complexity." While Jackson did not dispute that the RUGs III assessment tool was a valid attempt to assess the average frail, elderly patient, he did not believe that the RUGs III system adequately captured some of the time and care needs of high acuity patients. The witness opined that Drake Center represented the type of facility that could be considered a provider of outlier services under the provisions of the Ohio Administrative Code.

In finding that Drake Center failed to show that it serves residents with diagnoses or special care needs that are not adequately measured by RUGs III, the Court of Claims cited evidence at trial related to a fact-finding process undertaken by ODHS to determine whether so-called subacute residents were measured by the applicable assessment tool. Specifically, actions by ODHS included sending nurses to Drake Center and other facilities to collect patient data, the creation of a subacute task force to study whether there existed an outlier category composed of subacute residents, commissioning the Lewin Group to study the adequacy of the RUGs III assessment tool, and assisting HCFA by submitting Medicaid payment data to be used for a federal time study to determine the adequacy of the RUGs III system.[2]

The record supports the Court of Claim's finding that ODHS engaged in an analysis to determine whether there existed a population of subacute residents that required resources not measured adequately by the RUGs III system. Part of this process involved the establishment of a subacute task force committee, composed of ODHS employees and representatives from facilities around the state. The committee was subdivided into three task forces, clinical, financial, and one designated to consider federal regulations regarding admissions, transfers, and discharges. Drake Center initially participated in the study but later withdrew.

ODHS employee Kim Irwin, who participated in this study group, testified that the committee attempted to examine three different resident populations to determine whether these patients required outlier services. The three popula-

---

2. The record indicates that, at the time of trial, the results of the federal time study were not available.

tions were composed of pulmonary rehabilitation patients, "heavy-duty rehabilitation" patients, and patients with complex medical needs. Irwin testified that the committee was unable to reach a consensus as to whether there were subacute patients whose needs were not adequately measured by RUGs III. She further stated that ODHS was unable to conclude that there were identifiable residents with characteristics not already accounted for under the assessment tool.

As noted under the previous assignment of error, ODHS also commissioned Lewin–VHI, Inc. to study the state's reimbursement system and Barbara Manard, who participated in the study project, testified at trial that the state's reimbursement system pays reasonable and adequate rates to nursing facilities. The Lewin study found that there "was no statistically significant relationship between case mix and rate-to-cost coverage," thus indicating that "facilities with high case mix were as likely to make or lose money as facilities with low case mix."

Manard further testified that RUGs III adequately measures even the highest acuity patient. She stated that Ohio uses a "relative cost approach to further expand their opportunities within the normal framework for paying for the atypical" patient. The result of this approach is that "the state has designed a system that errs on the side of overpaying on direct care." Specifically, the state, in setting the limit for payment of costs, does not set the limit based on the median but, instead, utilizes "the median plus a factor, which is approximately 23 percent above the median."

A further generous feature of Ohio's system, according to Manard and as noted in the Lewin study, involves the "manner in which Ohio links the RUGs III case mix to payment," which "tends to overstate the relative resource use of Medicaid patients * * * in facilities like Drake Center that have a substantial proportion of Medicare patients." For instance, although Medicaid patients typically have lower acuity than Medicare patients and some private insurance patients, "Ohio determines a facility's case-mix score for Medicaid reimbursement purposes by including the case-mix or RUGs III score for every patient, regardless of payor," resulting in "a generous estimate of the actual case-mix acuity of Medicaid patients."

The Lewin study performed an analysis of whether Drake Center's low rate-to-cost coverage was related to the state's reimbursement system as opposed to possible inefficiencies at the facility itself. While Manard agreed that Drake Center served a "high acuity" patient, she did not agree with Drake Center's contention that reported losses on Medicaid patients were due to alleged deficiencies in the state's system for measuring patient acuity.

In analyzing Drake Center's reported losses on Medicaid patients, one area the Lewin study examined was Drake Center's occupancy rate. Manard stated that

Drake Center's occupancy rate of 77.6 percent in 1993 represented a "demonstrably low occupancy," noting that only 2.1 percent of nursing facilities had lower occupancy rates than the Drake Center in 1993. Through the use of multivariate analysis, the Lewin study determined that the average nursing facility sharing Drake Center's characteristics would have predicted costs of $240.41 per day as opposed to Drake Center's actual allowable per diem costs of $301.59. The Lewin study concluded that the difference between Drake Center's "predicted allowable per diem total costs and its reimbursement rate [$214.02 in 1993] was more than accounted for by its low occupancy rate." The study further determined that Drake Center's "low occupancy rate and its high cost structure" accounted for its rate-to-cost coverage ratio of 71.0 percent.

The Court of Claims heard other testimony indicating that the RUGs III system was developed with the intent of assessing "high acuity" residents. ODHS employee Sheila Lambowitz, who was involved in the implementation of the RUGs III system in Ohio, testified that time studies were conducted in 1990 and 1995 in which "high acuity residents were oversampled to make sure that we could make these distinctions." Lambowitz further testified, similar to Manard, that Ohio utilizes a "cost-related methodology," which factors in a facility's specific costs when calculating a case-mix score, thus resulting in a more generous reimbursement method than earlier systems in which a standard-cost case per mix unit was employed.

One of the concerns raised by Drake Center involved residents experiencing "acute episodes" at a point in time when they were not being assessed by MDS+; thus, it was contended, resources expended by a facility for such incidents were not being adequately measured. Lambowitz testified that RUGs III, while requiring a quarterly assessment, also provides for a look-back period to account for recent changes in a patient's condition occurring before the assessment period. Thus, the assessment instrument is designed to measure patients who experience an acute episode during their stay at the facility.

Kim Irwin also testified that the RUGs III system was designed to account for residents who experience acute episodes. Specifically, she stated as follows:

"I know what's been stated so far is that you have residents who have these blips in their care, where they have acute episodes of care, and they may be grouped in one of the lower measured categories; and if there had been an MDS Plus that indicated their care at the time when they had pneumonia or a urinary tract infection, it may bump them up to the special care category from the four that are below that and that these episodes happen on average once or twice per quarter per resident. And what's happening as far as assessment during that time is that throughout this quarter, every resident is going to get another quarterly assessment by the MDS Plus. That date, obviously, isn't all piled onto

the last day of the quarter * * *. So everybody has kind of a date that hits somewhere throughout this quarter.

"Even though the MDS and RUGs system itself doesn't demand that a new MDS happen right when this blip occurs, * * * we do demand * * * that a new assessment form be filled out quarterly.

"So if you look at what would happen to somebody who had * * * a seven-day regimen of IV antibiotic therapy, * * * let's say that within the next week, their quarterly due date came and the nurses filled out one of these forms.

"What they would run into are a couple questions that are going to capture it. If it was pneumonia, they are going to hit the question that says 'Check diseases that have had a relationship to status in Section K.' Also, if it was a urinary tract infection, it says, 'if there was one in the last 30 days. So if the assessment is filled out here, we know it's going to capture urinary tract infections beyond that little blip.

"In addition, if it was IV medication that they were treated with, and that's what made this time of service more intensive and takes more nursing time, it's going to capture it in the special treatment section, which asks—and, again, this is a point in time, and they look back and see what happened—'Did you receive IV medications any time in the last 14 days?' So there's two ways that we're going to capture patients who have these acute episodes."

At trial, Irwin disputed Drake Center's contention that RUGs III did not adequately measure the average length of stay of its residents. According to Irwin, the issue of average length of stay was factored into the original time study.

Another contention by Drake Center was that RUGs III did not adequately account for "multiple qualifiers," *i.e.*, residents that, under the assessment tool, have characteristics falling under more than one criterion (and thus raising the concern that such residents were not being placed in proper groups). Irwin testified that the RUGs III system, "through both its design and study, and through who was in the original sample," accounted for such residents. She stated that in visits to facilities that requested outlier status, the "phenomenon" of multiple qualifiers was prevalent. Irwin testified that when ODHS looked at the original time study of over seven thousand residents in seven states to determine whether all of these residents met only one criterion, "we could tell that people were qualifying in the original sample based on more than one criteri[on], also."

Todd Menenberg testified that Ohio's system makes an adjustment to case mix to allow facilities that treat highly acute patients to be compared to facilities with lower case-mix scores. Menenberg conducted an analysis to determine why

Drake Center was not receiving reimbursement for all of its rates. Menenberg looked at nine other high acuity facilities in the state. He first discussed Drake Center's cost figures related to care for "traditional geriatric patients," *i.e.,* those residents with lower case-mix scores. Menenberg, who noted that Drake Center's own experts did not claim that RUGs III inadequately measured this group, found that the costs at other facilities to treat these residents were dramatically less than Drake Center's costs.

Menenberg next looked at cost figures regarding residents with high case-mix scores. In comparing Drake Center with Aristocrat Berea, a facility with the highest case mix in the state, Menenberg found that Drake Center's costs were $2.6 million dollars per year higher than Aristocrat Berea to treat patients with the same case-mix score.

Upon review of the record in this case, we find that there was substantial evidence to support the Court of Claims' finding that Drake Center failed to show that it serves residents with diagnoses or special care needs that are not adequately measured by the applicable assessment instrument. Although Drake Center contended that it served a high acuity population that was not measured adequately by RUGs III, ODHS presented contrary evidence, including, as noted above, testimony that the RUGs III system was designed to account for high acuity residents; costs are adjusted for case mix to recognize that facilities with high acuity residents have higher costs than facilities with lower case-mix scores; in determining the average case-mix score, the state considers all residents regardless of the payor, often resulting in higher case-mix scores for facilities such as Drake Center that treat Medicare patients; the assessment tool adequately captures acute episodes, multiple qualifiers, and discharges; there is no relationship between rate-to-cost coverage and a facility's case mix; and the state's prospective reimbursement system is generous, resulting in approximately ninety-nine percent aggregate rate-to-cost coverage.

While the RUGs III system may not account for every conceivable variable, that fact alone does not prove that it is inadequate to measure the type of resident served by Drake Center. In the present case, the record indicates that ODHS engaged in an objective analysis to determine whether there was a need to recognize an outlier status for subacute patients. There was evidence at trial upon which the Court of Claims could have found that ODHS had a reasonable basis for concluding, at the present time, that the assessment instrument adequately measures such residents. Further, while Drake Center contended that most of its costs were necessary, there was considerable evidence that Drake Center's high cost structure was due to factors other than the state's method of reimbursement as indicated by the Lewin study and the testimony of Menenberg. Thus, based upon a review of the entire record, we find that the Court of Claims

did not err in finding that ODHS complied with R.C. 5111.257 and the regulations thereunder.

Based upon the foregoing, Drake Center's second assignment of error is not well taken and is overruled.

Under the third assignment of error, Drake Center contends that the Court of Claims erred in holding that the actions of ODHS did not violate Drake Center's state and federal constitutional rights. Drake Center raises both due process and equal protection claims.

■ Drake Center first contends that it has a property interest in its reimbursement rate as a qualified provider of outlier services, and that the failure of ODHS to provide Drake Center a hearing on these issues constitutes a due process violation. In addressing Drake Center's due process argument, the Court of Claims quoted *Barry, supra,* 56 Ohio St.3d, at paragraph two of the syllabus, for the proposition that "[i]n a due process determination, Medicaid providers have a legitimate property interest in the reimbursement rate provided under R.C. 5111.21, 5111.22 and Section 1396a(a)(13)(A), Title 42, U.S.Code." The Court of Claims held that while Drake Center is entitled to continued reimbursement under R.C. 5111.21 and 5111.22, which it has received and continues to receive, "it does not have a property interest in a reimbursement rate paid to qualified providers of outlier services as permitted by R.C. 5111.257 and the regulations promulgated thereunder." We agree.

■ In order to show a due process violation, Drake Center must first show that it has a constitutionally protected property right in status as a qualified provider of outlier services. A property interest must be based on "a legitimate claim of entitlement," and such an interest is "not created by the Constitution," but rather "by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colleges v. Roth* (1972), 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548, 561. It has been held that "the existence of provisions that retain for the state significant discretionary authority over the bestowal * * * of a government benefit" indicates a lack of entitlement to such benefits. *Senape v. Constantino* (C.A.2, 1991), 936 F.2d 687, 690. As previously discussed, R.C. 5111.257 vests ODHS with discretion in identifying outlier services and determining the status of facilities that provide such services. We conclude that the Court of Claims did not err in determining that Drake Center had failed to show a property interest in reimbursement as a provider of outlier services.

■ Drake Center also contends that the failure to pay it a reimbursement rate as an outlier constitutes an equal protection violation. More specifically,

Drake Center argues that ODHS treats Drake Center differently from a similarly situated provider, Aristocrat Berea, a facility that was grandfathered in under the provisions of Ohio Adm.Code 5101:3–3–25(D).

In *Wagner v. Armbruster* (1996), 108 Ohio App.3d 719, 730, 671 N.E.2d 630, 636–637, the court noted:

" 'The purpose of the equal protection guarantee is to ensure that similarly situated persons are treated similarly under the law.' *Andres* [*v. Perrysburg* (1988)], 47 Ohio App.3d [51] at 55, 546 N.E.2d [1377] at 1382. The equal protection guarantee prevents only invidious discrimination. If a fundamental right or suspect classification is not involved, then the classification is constitutional if it is rationally related to a legitimate government interest. " (Citation omitted.)

Drake Center acknowledges that no suspect class or fundamental interest is at stake; thus, ODHS's classification of certain facilities as qualified providers of outlier services is constitutionally valid if it has a rational basis. In the present case, the Court of Claims held that the decisions by ODHS in classifying certain facilities as providers of outlier services were "rationally related to the state's legitimate interests in cost containment for the state plan and in caring for those patients designated as outliers." We agree with the Court of Claims' determination on this issue. See *Barry, supra,* 56 Ohio St.3d at 129, 564 N.E.2d at 694–695, quoting *Colorado Health Care Assn. v. Colorado Dept. of Social Serv.* (D.Colo.1984), 598 F.Supp. 1400, at 1407 ("Budgetary considerations can enter into a state's evaluation and development of a funding plan. * * * States are afforded wide latitude in formulating specific medical plans.' ").

Further, we agree with ODHS's contention that Drake Center and Aristocrat Berea are not similarly situated. As noted by ODHS, Drake Center sought reimbursement as an outlier for its entire facility, whereas Aristocrat Berea was grandfathered in as an outlier only for its ventilator unit. Kim Irwin testified at trial that Aristocrat Berea, which had a separate provider agreement as to its ventilator unit, was grandfathered in because the facility "had an isolated population, and we didn't know how the new system was going to treat them yet." Irwin further testified that when the case mix at Aristocrat Berea was later examined, it was determined that their costs were being adequately assessed by the instrument, so that "essentially, they got for their direct care rate the same rate they would have gotten under RUGs."

Drake Center's third assignment of error is without merit and is overruled.

Under its fourth assignment of error, Drake Center contends that ODHS has breached provisions of its provider agreement by failing to pay Drake Center its reasonable and adequate rates. Drake Center reiterates its earlier conten-

tions that the actions of ODHS were in violation of the Boren Amendment and R.C. 5111.257.

■ Contractual rights are "defined by the state's compliance with federal law pertaining to medicaid reimbursement," and where a state is found to be in conformity with federal regulations, an appellant lacks a basis for a contractual claim. *Colorado Health Care Assn., supra,* 842 F.2d at 1172. We have previously determined, under the first and second assignments of error, that the state complied with the applicable laws relating to Medicaid reimbursement.

Drake Center's fourth assignment of error is overruled.

■ Under its fifth assignment of error, Drake Center contends that the Court of Claims erred in holding that Drake Center was not entitled to judgment on its claims of *quantum meruit* and promissory estoppel. Drake Center initially asserts that it is entitled to recovery under the theory of *quantum meruit* on the basis that "ODHS pretended to consider the outlier request of Drake, but never intended to grant it."

■ The doctrine of *quantum meruit* is inapplicable "if an express agreement existed concerning the services for which compensation is sought; the parameters of the agreement limit the parties's recovery, in the absence of bad faith, fraud or illegality." *Pawlus v. Bartrug* (1996), 109 Ohio App.3d 796, 800, 673 N.E.2d 188, 191. In the present case, the Court of Claims noted that the provider agreements between ODHS and Drake Center "are expressly written and establish a binding contractual relationship." The Court of Claims determined that Drake Center had been paid the Medicaid reimbursement rate established by statute and thus denied Drake Center's *quantum meruit* claim. We find no error. Because there existed an express agreement, the Court of Claims was not at liberty to override the terms of that agreement.

■ Drake Center also contends that the Court of Claims erred in failing to find ODHS liable under the theory of promissory estoppel. Drake Center asserts that ODHS made a number of assurances that it would pay Drake Center an outlier rate.

■ In general, the theory of promissory estoppel "may not be applied against the state or its agencies when the act or omission relied on involves the exercise of a governmental function." *Sun Refining & Marketing Co. v. Brennan* (1987), 31 Ohio St.3d 306, 307, 31 OBR 584, 585, 511 N.E.2d 112, 114. Further, in instances where promissory estoppel is alleged, the promise must be clear and unambiguous. *Easterling v. Miller* (Dec. 31, 1997), Lawrence App. No. 97 CA 16, unreported.

In the instant case, even assuming the doctrine of promissory estoppel to be applicable, the evidence does not support its application in this case. At trial, former Drake Center employee Michael Bradford testified on behalf of Drake Center. When asked whether ODHS ever made assurances about reimbursement, Bradford stated that ODHS employee John Nichols told him, "We're going to get around to this outlier thing."

John Nichols subsequently testified and he was asked whether ODHS gave assurances to Drake Center or other facilities about receiving outlier status. Nichols testified as follows:

"We said that to our knowledge and extent of information, there—other than pediatric and special high—high utilization, high acuity of TBIs, we had not defined a population * * * that we felt was not measured by the MDS Plus system.

"So, therefore, we were telling them that * * * at that particular time we were not able to define an outlier classification that they fit in.

"What we indicated was that at any point in time—and I'm assuming this is a reasonable * * * time—that if we found documentation that the MDS Plus system was not meeting—that it was not defining a population and they had applied for it, that we would go back retroactively and correct their payment."

Thus, the evidence indicates that any representations involved assurances that if ODHS determined that certain populations were not being adequately measured by the applicable assessment tool, ODHS would provide reimbursement. Those representations do not rise to the level of assurances that ODHS would recognize Drake Center as a provider of outlier services, and the record suggests that Drake Center understood that fact based upon its initial participation on the subacute task force that was formed to determine whether a subacute population existed that should be recognized under the outlier statute.

The fifth assignment of error is without merit and is overruled.

Drake Center contends, under its sixth assignment of error, that the Court of Claims erred in failing to grant its request for declaratory and injunctive relief. Based upon our disposition of the first and second assignments of error, this argument is without merit.

The sixth assignment of error is overruled.

▮▮▮▮ Under the seventh assignment of error, Drake Center contends that the Court of Claims erred in failing to consider its rebuttal evidence. Drake Center's argument is apparently based on the contention that the decision of the Court of Claims fails to refer to the rebuttal witnesses presented by Drake Center at trial. Drake Center cites no authority for the proposition that the trial

court is required to cite the entire evidence upon which it based its decision. The decision of the Court of Claims states that the court "carefully reviewed" the evidence regarding the issue of compliance with the Boren Amendment. In the absence of an indication to the contrary, an appellate court will presume regularity in the proceedings and judgment of the trial court. *Palmer v. Kaiser Foundation Health* (1991), 64 Ohio App.3d 140, 143, 580 N.E.2d 849, 851.

Drake Center's seventh assignment of error is overruled.

■ Under the eighth assignment of error, Drake Center contends that the Court of Claims erred in failing to issue separate findings of fact and conclusions of law as requested by Drake Center under Civ.R. 52.

Civ.R. 52 provides:

"When questions of fact are tried by the court without a jury, judgment may be general for the prevailing party unless one of the parties in writing requests otherwise before the entry of judgment pursuant to Civ.R. 58, or not later than seven days after the party filing the request has been given notice of the court's announcement of its decision, whichever is later, in which case, the court shall state in writing the conclusions of fact found separately from the conclusions of law.

" * * *

"An opinion or memorandum of decision filed in the action prior to judgment entry and containing findings of fact and conclusions of law stated separately shall be sufficient to satisfy the requirements of this rule and Rule 41(B)(2)."

In *Davis v. Wilkerson* (1986), 29 Ohio App.3d 100, 101, 29 OBR 112, 113, 503 N.E.2d 210, 211–212, the court held as follows:

"The purpose of separately stated findings of fact and conclusions of law is to enable a reviewing court to determine the existence of assigned error. * * *

"If the court's ruling or memorandum opinion, together with other parts of the trial court's record, provides an adequate basis upon which to decide the legal issues presented, there is substantial compliance with Civ.R. 52. * * * In such cases, the failure of the trial court to make findings of fact and conclusions of law constitutes harmless error."

Following the court's decision, Drake Center filed a request for separate findings of fact and conclusions of law. The Court of Claims denied the request on the basis that it "has already rendered its findings of fact and conclusions of law in its nineteen-page decision filed on April 1, 1997." Upon review, we agree with the Court of Claims that its April 1 decision satisfied the requirements of Civ.R. 52, as it "sufficiently sets forth the basis of its ruling, and this court has an

adequate basis upon which to decide the assignments of error presented." *Abney v. W. Res. Mut. Cas. Co.* (1991), 76 Ohio App.3d 424, 431, 602 N.E.2d 348, 352.

Drake Center's eighth assignment of error is without merit and is overruled.

Under its ninth assignment of error, Drake Center asserts that the Court of Claims erred in failing to grant Drake Center's motion for new trial. The record indicates that Drake Center's motion for new trial asserted that the judgment was against the manifest weight of the evidence and that Drake Center had obtained newly discovered evidence. To the extent that Drake Center contends that the Court of Claims erred in failing to grant a new trial based on the weight of the evidence, this argument, in light of our disposition of the previous assignments of error, is without merit. There was sufficient evidence in the record to support the factual determinations of the Court of Claims.

Regarding the issue of newly discovered evidence, Drake asserted before the Court of Claims that subsequent to trial it had discovered "the outline of a report" prepared by one of ODHS's witnesses at trial, Todd Menenberg, which Drake Center claimed "impugns the ODHS method of analysis of an 'efficient and economical' provider."

ODHS filed a memorandum in opposition to Drake Center's motion for new trial, noting that the "newly discovered" evidence was from a seminar that took place over three years ago. ODHS further asserted that the report at issue was not written by Menenberg. ODHS attached an affidavit of Menenberg in which he averred:

"I am surprised about, disappointed in, and cannot appreciate the misrepresentations made by plaintiff's counsel. Throughout the plaintiff's brief as can be seen, there are numerous references to a 'report prepared by Mr. Menenberg' at a National Health Lawyers Association conference in January 1994. * * *

"No such report was issued by me.

"* * * The report plaintiff's counsel ascribes to me appears to be statements of Joseph Lubarsky, another presenter at the 1994 conference.

"As I recall, I was invited by the NHLA to the conference to debate and critique Mr. Lubarsky's opinions, which Lubarsky opinions plaintiff's counsel now calls mine."

Civ.R. 59(A)(8) provides that a new trial may be granted on the basis of "[n]ewly discovered evidence, material for the party applying, which with reasonable diligence he could not have discovered and produced at trial." A trial court's decision whether to grant a new trial based on newly discovered evidence is within the sound discretion of the trial court. *Rohde v. Farmer* (1970), 23 Ohio St.2d 82, 52 O.O.2d 376, 262 N.E.2d 685. "Evidence which is inadvertently not

presented at trial is insufficient grounds for a new trial * * * unless the evidence could not have been discovered and produced at trial through * * * reasonable diligence." *Johnson v. Johnson* (Aug. 30, 1995), Montgomery App. No. 14791, unreported, 1995 WL 516467. Upon review of the record, indicating that the report at issue was not written by ODHS's witness, Menenberg, and that the report was from a seminar that took place over three years prior to trial, we find that the Court of Claims did not abuse its discretion in failing to grant a new trial.

Drake Center's ninth assignment of error is without merit and is overruled.

Based on the foregoing, the first, second, third, fourth, fifth, sixth, seventh, eighth, and ninth assignments of error of Drake Center are overruled, and the judgment of the Court of Claims is hereby affirmed.

*Judgment affirmed.*

PEGGY BRYANT and LAZARUS, JJ., concur.