OHIO DEPARTMENT OF NATURAL RESOURCES,
DIVISION OF RECLAMATION, Appellant,

v.

HEMLOCK PIPELINE, INC. et al., Appellees.

[Cite as *Ohio Dept. of Natl. Resources, Div. of Reclamation
v. Hemlock Pipeline, Inc.* (1991), 77 Ohio App.3d 668.]

Court of Appeals of Ohio,
Meigs County.

No. 447.

Decided Oct. 14, 1991.

*Lee I. Fisher*, Attorney General, and *Douglas C. Jones*, Assistant Attorney General, for appellant.

*Crow & Crow* and *I. Carson Crow*, for appellees.

---

STEPHENSON, Presiding Judge.

This is an appeal from a judgment entered by the Meigs County Common Pleas Court following a bench trial in favor of Hemlock Pipelines, Inc. and

Nancy J. Campbell, defendants below and appellees herein. The Ohio Department of Natural Resources, Division of Reclamation, plaintiff below and appellant herein, appeals and assigns the following error:

"The trial court erred, as a matter of law, in holding that the Ohio Department of Natural Resources is estopped from recovering an overpayment made to a contractor."

The following facts are pertinent to this appeal. In 1985, appellant contracted with appellees to have appellee Hemlock Pipelines, Inc. perform mine shaft stabilization work in Wellston Reclamation Project No. JK–WL–1 in Jackson, Ohio. On April 29, 1987, appellants made a payment of $39,673.23 to appellees. Subsequently, appellant contacted appellees about the April 29, 1987 payment claiming there was an overpayment of $29,200.

When the parties were unable to reach a settlement, appellant filed a suit in the Meigs County Common Pleas Court on June 7, 1988. In the complaint, appellant averred that appellee refused to return the overpayment of $29,200. As damages, appellant sought $21,602.01 ($29,200 less a setoff of $7,597.99 for other work performed by appellees). Appellees answered on July 7, 1988 denying liability.

The case went to trial before the court on May 23, 1990. The lower court filed an Opinion and Judgment Entry on June 13, 1990 wherein it made the following findings:

"(1) The Department of Natural Resources entered into a contract with Hemlock Pipeline for work on the Wellston project. Said contract provided for compensation not to exceed $259,919 or the total cost of the work performed, whichever was less based on certain unit costs contained in the contract.

"(2) The Department of Natural Resources requested that certain 18″ drill holes contained in the contract be changed to 8″ drill holes after the commencing of the project, due to circumstances not forseen [sic] by either party at the time of signing the contract.

"(3) Defendant Hemlock agreed to these changes and changed their arrangements with their subcontractor accordingly.

"(4) The Department of Natural Resources through inspector Sheehan exercised nearly continuance [sic] supervision over the work of Hemlock and its subcontractors at the Wellston site.

"(5) The Department of Natural Resources provided defendant Hemlock with quantities to be utilized in preparing several different billings sent to the Department of Natural Resources by defendant Hemlock.

"(6) The billings (called Contractor's Estimates) were reviewed by no less than four employees of the Department of Natural Resources.

"(7) The Chief of the Department of Natural Resources and the Director of the Department of Natural Resources certified that each estimate was money due and owing Hemlock.

"(8) The State of Ohio issued warrants to the defendant Hemlock in accordance with the estimates approved by the Department of Natural Resources.

"(9) Through an error in paperwork by Mark Sheehan, the State paid Hemlock $29,200 more than the inspector's field notes of quantities used should have entitled Hemlock to receive.

"(10) Defendant Hemlock relied on the information provided by the Department of Natural Resources in submitting their billings and in paying their subcontractor.

"(11) The State only realized its error 11 months after the final payment to Hemlock.

"(12) Defendant Hemlock committed no fraud, error, or other misrepresentation to induce the State to pay the sums in question."

The court determined that while generally in cases similar to the case at bar, appellant would be able to recover the overpayment, it would be inequitable to allow a recovery in this case. The court found that the state approved the billings and that appellees relied upon the erroneous information in expending monies to its subcontractors. The lower court concluded, "It would be unfair and unjust to allow the state to hide behind some claimed shield of immunity and allow it to make any errors it pleases causing others to suffer harm with no possibility of court intervention to protect innocent parties."

Essentially, the court held that since appellees relied to their detriment on the erroneous overpayment, appellant was estopped from recovering that money. In its sole assignment of error, appellant argues that estoppel cannot be applied against the state. Appellant contends that its actions with respect to reclamation were governmental actions as opposed to proprietary actions, and with respect to such actions, estoppel is inapplicable.

Most of the law in this area is concerned with the classification of whether an act was governmental or proprietary in the context of liability suits against the state or subdivision thereof. In an early case, the Ohio Supreme Court stated the following in *Wooster v. Arbenz* (1927), 116 Ohio St. 281, 284–285, 156 N.E. 210, 211–212:

"In performing those duties which are imposed upon the state as obligations of sovereignty, such as protection from crime, or fires, or contagion, or

preserving the peace and health of citizens and protecting their property, it is settled that the function is governmental, and if the municipality undertakes the performance of those functions, whether voluntarily or by legislative imposition, the municipality becomes an arm of sovereignty and a governmental agency and is entitled to that immunity from liability which is enjoyed by the state itself. If, on the other hand, there is no obligation on the part of the municipality to perform them, but it does in fact do so for the comfort and convenience of its citizens, for which the city is directly compensated by levying assessments upon property, or where it is indirectly benefited by growth and prosperity of the city and its inhabitants, and the city has an election whether to do or omit to do those acts the function is private and proprietary.

"Another familiar test is whether the act is for the common good of all the people of the state, or whether it relates to special corporate benefit or profit. In the former class may be mentioned the police, fire, and health departments, and in the latter class utilities to supply water, light, and public markets." (See, also, *Moloney v. Columbus* [1965], 2 Ohio St.2d 213, 218, 31 O.O.2d 447, 449–450, 208 N.E.2d 141, 145; *Eversole v. Columbus* [1959], 169 Ohio St. 205, 208, 8 O.O.2d 167, 169, 158 N.E.2d 515, 518.)

Again, concerning tort liability and not directly applicable to the case *sub judice*, the General Assembly recently enacted the Political Subdivision Tort Liability Act codified in R.C. Chapter 2744. See Am.Sub.H.B. No. 176 (141 Ohio Laws, Part I, 1699, 1707 *et seq.*). R.C. 2744.01 is the definitional section and sets forth, *inter alia*, the following:

"(C)(1) 'Governmental function' means a function of a political subdivision that is specified in division (C)(2) of this section or that satisfies any of the following:

"(a) A function that is imposed upon the state as an obligation of sovereignty and that is performed by a political subdivision voluntarily or pursuant to legislative requirement;

"(b) A function that is for the common good of all citizens of the state;

"(c) A function that promotes or preserves the public peace, health, safety, or welfare; that involves activities that are not engaged in or not customarily engaged in by nongovernmental persons; and that is not specified in division (G)(2) of this section as a proprietary function.

"* * *

"(G)(1) 'Proprietary function' means a function of a political subdivision that is specified in division (G)(2) of this section or that satisfies both of the following:

"(a) The function is not one described in division (C)(1)(a) or (b) of this section and is not one specified in division (C)(2) of this section;

"(b) The function is one that promotes or preserves the public peace, health, safety, or welfare and that involves activities that are customarily engaged in by nongovernmental persons."

Although the above cited passages are helpful in analyzing the governmental-proprietary dichotomy, they are not dispositive. There is no litmus test which can be applied. Each case must be decided upon its own particular facts. In reviewing the case at bar, we hold that actions taken by appellant were governmental.

The reclamation in the case at bar was done pursuant to R.C. Chapter 1513. Thus, it was a duty performed pursuant to statute. Apparently, the state becomes involved in reclamation when there is no money held in the strip mining reclamation fund. See R.C. 1513.20. The purpose of reclamation is to nearly as possible place the property back into the position it was in prior to the strip mining. This is basically in furtherance of "the public peace, health, safety, or welfare" in situations where if it were not done by the state, it would not be done at all. See R.C. 2744.01(C)(1)(c). Because the government reclaims property statewide, the service is "for the common good of all the people of the state." See *Arbenz, supra.*

Appellee contends that since appellant was significantly involved in supervising the reclamation and in fact exercised "de facto" control over the project, it was a proprietary function. We disagree. How much control appellant wielded over the reclamation project is not indicative of whether it was performing a governmental or proprietary function. The pertinent issue involves the type of function the government is performing. As noted *supra,* reclamation fits into the category of governmental functions.

Because appellant was engaged in a governmental function, it is a long-settled principle that estoppel cannot be applied against it. See *Ohio State Bd. of Pharmacy v. Frantz* (1990), 51 Ohio St.3d 143, 555 N.E.2d 630; *Sun Refining & Marketing Corp. v. Brennan* (1987), 31 Ohio St.3d 306, 31 OBR 584, 511 N.E.2d 112; *Griffith v. J.C. Penney Co.* (1986), 24 Ohio St.3d 112, 24 OBR 304, 493 N.E.2d 959; *Besl Corp. v. Pub. Util. Comm.* (1976), 45 Ohio St.2d 146, 74 O.O.2d 262, 341 N.E.2d 835; *Davis v. Ohio Bur. of Emp. Serv.* (1988), 51 Ohio App.3d 87, 554 N.E.2d 1340; *Gaston v. Bd. of Review* (1983), 17 Ohio App.3d 12, 17 OBR 58, 477 N.E.2d 460. The court below specifically found that appellant had overpaid appellee $29,200. Since the court's only reasoning that appellant was not entitled to repayment was based upon estoppel, and further since estoppel cannot be applied against the state, we

reverse and remand the cause for further proceedings consistent with this opinion.[1]

*Judgment reversed*
*and cause remanded.*

GREY, J., concurs.

PETER B. ABELE, J., concurs with separate opinion.

PETER B. ABELE, Judge, concurring.

I concur in the judgment and the majority opinion.

The majority opinion correctly holds that the doctrine of estoppel does not apply against the state or its agencies in the exercise of a governmental function. *Ohio State Bd. of Pharmacy v. Frantz* (1990), 51 Ohio St.3d 143, 555 N.E.2d 630. However, after a review of the facts in the instant case I understand the trial court's unwillingness to grant any recovery in favor of the Ohio Department of Natural Resources. The trial court noted that "it would be unfair and unjust to allow the State to *, * * make any errors it pleases causing others to suffer harm with no possibility of Court intervention to protect innocent parties."

Again, as the majority opinion notes the law in Ohio is clear. Further, the court of appeals is bound and must follow the decisions of the Ohio Supreme Court. See *Thacker v. Bd. of Trustees of Ohio State Univ.* (1971), 31 Ohio App.2d 17, 60 O.O.2d 65, 285 N.E.2d 380. This is a harsh rule that, as applied in this case, has exacted a harsh result.

---

1. While we are sustaining appellant's sole assignment of error, we believe that there are cogent reasons why estoppel should be applicable against the state in contract situations. Federal courts have long recognized that the United States would have an unfair bargaining advantage to lay traps for unsuspecting business people if estoppel were not available. See, *e.g., Whike Constr. Co. v. United States* (Ct.Cl.1956), 140 F.Supp. 560, 135 Ct.Cl. 126. However, the law in the state of Ohio is clear and until the Supreme Court rules otherwise, we will continue to adhere to the proposition that estoppel cannot be applied against the state when the state is engaged in a governmental function.