[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] OPINION
{¶ 1} Plaintiff, Dehlendorf Company, filed this action against defendants Jefferson Township, Jefferson Water Sewer District ("JWSD"), and the individual trustees of the JWSD, seeking damages for the defendants' alleged breach of contract, damages based upon a claim of promissory estoppel, as well as damages based upon an alleged violation of R.C. 121.22. On April 25, 2001, the individual defendants and defendant Jefferson Township were dismissed. On February 1, 2002, the trial court granted summary judgment in favor of the JWSD. Plaintiff now appeals the grant of summary judgment raising the following four assignments of error:[1]
 {¶ 2} "1. The Trial Court erred in granting Defendant/Appellee Jefferson Water Sewer District Summary Judgment on Count I of Appellant's Complaint and in concluding that no genuine issues of material fact remain unresolved with respect to Count I of Appellant's Complaint.
 {¶ 3} "2. The Trial Court erred in granting Defendant/Appellee Jefferson Water Sewer District Summary Judgment on Count II of Plaintiff's Complaint and in concluding that no genuine issues of material fact remain unresolved with respect to Count II of Appellant's Complaint.
 {¶ 4} "3. The Trial Court erred in granting Defendant/Appellee Jefferson Water Sewer District Summary Judgment on Count III of Plaintiff's Complaint and in concluding that no genuine issues of material fact remain unresolved with respect to Count III of Appellant's Complaint.
 {¶ 5} "4. The Trial Court erred in granting Defendant/Appellee Jefferson Water Sewer District Summary Judgment on Count IV of Plaintiff's Complaint and in concluding that no genuine issues of material fact remain unresolved with respect to Count IV of Appellant's Complaint."
 {¶ 6} Plaintiff seeks a determination that the trial court incorrectly entered summary judgment in favor of JWSD. In order to make that determination, we review the facts and law applicable to this case independently, without deference to the findings, legal conclusions, or ruling of the trial court. Grafton v. Ohio Edison Co. (1996),77 Ohio St.3d 102.
 {¶ 7} A motion for summary judgment allows a court to terminate litigation where a resolution of factual or legal dispute is unnecessary. In order to obtain summary judgment, a party must establish: (1) that there is no genuine issue as to any material fact; (2) that reasonable minds can come to but one conclusion, adverse to the nonmoving party; and (3) that the party is entitled to judgment as a matter of law. Harless v. Willis Day Warehousing Co. (1978),54 Ohio St.2d 64. Specifically, Civ.R. 56(C) provides:
 {¶ 8} "* * * Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. * * *"
 {¶ 9} The Ohio Supreme Court has held that in order for a motion for summary judgment to be granted, the moving party "bears the initial burden of demonstrating that there are no genuine issues of material fact concerning an essential element of the opponent's case." Dresher v. Burt (1996), 75 Ohio St.3d 280. In order to carry this burden:
 {¶ 10} "* * * [T]he movant must be able to point to evidentiary materials of the type listed in Civ.R. 56(C) that a court is to consider in rendering summary judgment. * * * These evidentiary materials must show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. * * *" Id. at 292-293.
 {¶ 11} Although the court must view the facts in a light most favorable to the nonmoving party, Temple v. Wean United, Inc. (1977),50 Ohio St.2d 317, when a properly supported motion for summary judgment is made, the nonmoving party is not permitted to rest upon the allegations or denials contained in his or her pleadings but must come forward with specific facts showing the existence of a genuine issue for trial. Wing v. Anchor Media, Ltd. of Texas (1991), 59 Ohio St.3d 108,111, following Celotex Corp. v. Catrett (1986), 477 U.S. 317,106 S.Ct. 2548; and Morris v. Ohio Casualty Ins. Co. (1988), 35 Ohio St.3d 45.
 {¶ 12} Plaintiff is an Ohio corporation which develops commercial and residential real estate. In 1996, plaintiff negotiated an option to purchase property located in Jefferson Township, Ohio. According to the deposition testimony of Michael Dehlendorf, plaintiff's president, plaintiff planned to develop this property into a residential community. In order to carry out its development plans, plaintiff needed the permission of Jefferson Township to rezone the property. In turn, before submitting its application for a change of zoning, plaintiff inquired, and Jefferson Township confirmed, that plaintiff would need confirmation that JSWD could provide water and sanitary sewer service to the planned community. In response to plaintiff's inquiry, in July 1996, Richard Fridley, JWSD's director, sent the following letter to plaintiff, which appears in the record as follows:
 {¶ 13} Dehlendorf and Company
 454 East Main Street Suite 200 Columbus, Ohio 43215-5310
Dear Mr. Dehlendorf:
 We are pleased to advise that the Jefferson Water and Sewer District its successor or assigns will furnish water and sewer service for your proposed Clear Creek Crossing development as will [sic] as service to the Morrison tract located at Waggoner and Havens Corner Road in the Township of Jefferson, Franklin County, Ohio.
We look forward to working with you on the proposed development.
Very truly yours,
 /s/ R.E. Fridley Richard E. Fridley Director nlw
 {¶ 14} After completion, plaintiff's zoning application was submitted and granted, and, according to plaintiff, in reliance upon the letter written by Mr. Fridley, plaintiff continued its efforts to develop the property into a residential community. In its complaint, plaintiff claims that these efforts included the continuation of option payments on its contract to purchase the undeveloped property from its current owner.
 {¶ 15} In May 1997, plaintiff chose to modify the development plans for its community and, accordingly, applied to modify its original zoning application. In order to do so, plaintiff again asked JWSD if it could provide water and sanitary sewer service to the proposed community as modified in the second application. In May 1997, Mr. Fridley sent the following letter to plaintiff. That letter, as it appears in the record, stated:
 {¶ 16} May 15, 1997
 Dehlendorf and Company Suite 205 670 Morrison Road Gahanna, Ohio 43230-5324 Ref: Morrison Farms Attn: Mr. Mike Dehlendorf
Dear Mr. Dehlendorf,
 We are pleased to advise that the area at the corner of Waggoner Road and Havens Corners Road known as the Morrison Farms can be serviced with sewer service by the Jefferson Water and Sewer District. We anticipate that obtaining EPA approval may take several months so that it may be as long as one year before construction can be completed.
 Any attempt to annex this parcel out of the township will be met with vigorous resistance.
Thank you for your cooperation.
Sincerely,
 /s/ R.E. Fridley Richard E. Fridley Director
 {¶ 17} In its first assignment of error, plaintiff argues that JWSD's first and second letters constitute a written contract which it relied upon and understood to mean that JWSD had committed itself to providing water and sewer service to the Morrison Farms Property on or before May 15, 1998. Plaintiff also claims that had it known that JWSD was not going to be able to provide service on or before May 15, 1998, it would not have continued in its efforts to develop the property. In contrast, JWSD argues that neither of the letters satisfy the requirements of a binding written contract.
 {¶ 18} The construction or interpretation of a contract is a matter of law to be resolved by the court. Unlike determinations of fact which are given deference, questions of law are reviewed by appellate courts de novo. Lovewell v. Physicians Ins. Co. of Ohio (1997),79 Ohio St.3d 143, 144. "The cardinal purpose for judicial examination of any written instrument is to ascertain and give effect to the intent of the parties. * * * `The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement.'" Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth. (1997), 78 Ohio St.3d 353, 361. See, also, Skivolocki v. East Ohio Gas Co. (1974), 38 Ohio St.2d 244, paragraph one of the syllabus.
 {¶ 19} "To prove the existence of a contract, a party must establish the essential elements of a contract: an offer, an acceptance, a meeting of the minds, an exchange of consideration, and certainty as to the essential terms of the contract. * * * `In order to declare the existence of a contract, both parties to the contract must consent to its terms * * * there must be a meeting of the minds of both parties * * * and the contract must be definite and certain.' * * * In order to prove the existence of a written contract, the essential elements of the contract must be part of a writing, or part of multiple writings that are part of the same contractual transaction." Juhasz v. Costanzo (2001),144 Ohio App.3d 756, 762. (Citations omitted.)
 {¶ 20} See, also, Perlmuter Printing Co. v. Strome, Inc. (N.D.Ohio. 1976), 436 F. Supp. 409, and Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations (1991), 61 Ohio St.3d 366.
 {¶ 21} Further, a valid contract must be specific as to its essential terms, such as the identity of the parties to be bound, the subject matter of the contract, the consideration to be exchanged, the quantity if applicable, and the price to be paid. Alligood v. Proctor Gamble Co. (1991), 72 Ohio App.3d 309, 311. Additionally, an enforceable agreement must be mutual and must bind all parties to the contract. Fanning v. Insurance Co. (1881), 37 Ohio St. 339, 343-344.
 {¶ 22} Upon review, we agree with the trial court's determination that the two letters written by Mr. Fridley do not meet the requirements of an binding, enforceable written contract. After examining the letters, we find that they fail to contain any discernable offer or acceptance. They also fail to contain any manifest promise or any mention of an exchange of mutual consideration. Plaintiff's only claim of reciprocal consideration that he did not attempt to annex the Jefferson Township property into the city of Columbus is nowhere to be found in the letters or other written documentation, and there is also no indication that plaintiff s forbearance was ever communicated to JWSD. Moreover, during the course of his deposition, Mr. Dehlendorf stated that the purpose of the two letters was "to make [the] zoning application complete" at the request of Jefferson Township. (Dehlendorf Depo. at 82-84, 89, 113, 116.) Plaintiff also conceded that it had not requested or received similar letters for previous projects located outside of Jefferson Township, such as those in the city of Columbus. Id. at 87, 95. Finally, reviewing Mr. Fridley's letters for compliance with the requirements of a unilateral contract, we are unable to find any indication of an offer, or any indication of what performance or forbearance would constitute acceptance.
 {¶ 23} Having carefully reviewed the letters in question, and having thoroughly considered each of the arguments presented by the parties, we are unable to ascertain that the parties involved reached a "meeting of the minds." Accordingly, plaintiff's first assignment of error is overruled.
 {¶ 24} In its second assignment of error, plaintiff insists that the trial court erred when it granted JWSD summary judgment on plaintiff's claim that JWSD breached two written agreements for the purchase of sewer taps. The agreements alleged to have been breached were entered into on June 18, 1998 and July 24, 1998, and both detailed a plan for the construction of sanitary sewer connecting lines which would allow plaintiff to tap into in order to service plaintiff's proposed developments. The agreements also provided for the sale and purchase of the right to tap into JWSD's connecting line in order to serve plaintiff's property. Both parties agree that these documents satisfy all of the criteria of valid written contracts.
 {¶ 25} Although plaintiff claims that the trial court erred when it determined that JWSD had not breached the sewer tap agreements, we are unable to find that the trial court incorrectly reached this conclusion.
 {¶ 26} In Count II of its complaint, plaintiff set forth the following allegation:
 {¶ 27} "Pursuant to the June 18th 1998 Agreement and the July 24th 1998 Agreement, Defendant Jefferson Water Sewer District had promised to make available to Plaintiff for the Property up to 161 residential sanitary sewer taps in the June 18th 1998 Agreement or 108 residential sanitary sewer taps and 72 condominium unit sanitary sewer taps in the July 24th 1998 Agreement.
 {¶ 28} "Shortly after executing the July 24th 1998 Agreement, Plaintiff discovered that Defendant Jefferson Water Sewer District could not provide sanitary sewer service to the Property therefore making it impossible for Defendant Jefferson Water Sewer District to comply with the terms and conditions of the June 18th 1998 Agreement or the July 24th Agreement.
 {¶ 29} "Defendant Jefferson Water Sewer District breached the terms and conditions of the June 28, 1998 Agreement and/or the July 24th 1998 Agreement with Plaintiff." (Internal paragraph numbers omitted.)
 {¶ 30} In support of its motion for summary judgment, JWSD argued that there was no evidence that it had breached either the June or July 1998 agreements. Specifically, JWSD argued that after the parties executed the agreements, it had been actively engaged in obtaining the permits necessary to install the sewer line extensions that would enable plaintiff to connect to its water treatment system. Pursuant to the two contracts, all of the infrastructure required to service plaintiff's proposed developments was required to be constructed by plaintiff, who was then obligated to turn ownership of those improvements to JWSD. Particularly, JWSD maintained that in December 1998, it had obtained formal approval from the Environmental Protection Agency ("EPA") of what is known as a PTI, or Permit To Install, allowing JWSD to install the extension from which plaintiff would service the Morrison Farms property. However, at that time, plaintiff had not acquired title to the property, nor had it constructed any of the infrastructure within either of the developments as mandated by the parties' agreements.
 {¶ 31} At that time, plaintiff had also failed to furnish JWSD with a letter of credit as called for in the parties' contracts on the basis that it would have been "foolish" to do so. (Dehlendorf depo. at 210.) Approximately one month after entering into the tap contracts, in January 1999, plaintiff decided to voluntarily abandon its efforts to develop the property and sold its option to purchase the property to another entity which successfully developed the property into a viable residential community. When questioned why plaintiff chose to sell its option to purchase the property, Mr. Dehlendorf stated that it did so because the city of Columbus had filed an appeal of the EPA's decision to issue JWSD a PTI. In spite of conflicting statements which plaintiff gave in opposition to JWSD's motion for summary judgment, during the course of his deposition, Mr. Dehlendorf clearly stated that: "I believe that I made the conscious decision that until the City of Columbus appeal before the Environmental Review Appeals Commission was resolved, that I wasn't willing to take the risk of developing the Morrison farm." (Dehlendorf depo. at 209, 221.)
 {¶ 32} In response to plaintiff's earlier claim that it had been forced to abandon the project because JWSD had allegedly breached the June and July 1998 agreements by not completing construction of sewer mains by May 1998, JWSD referred the trial court to a portion of the deposition of Mr. Dehlendorf, wherein he admitted that he knew as early as 1996 that sewer lines would need to be constructed in order to allow service to be provided to his proposed developments, and that he also knew that the process was a lengthy one and in some cases could take over a year to complete. (Dehlendorf depo. at 120-122, 124, 157.) JWSD also pointed out that the May 15, 1997 letter which plaintiff claimed was a contract, and upon which plaintiff claimed to have relied, clearly stated that EPA approval was necessary in order to construct the sewer mains, and that the process of obtaining EPA approval for a PTI, in some cases, could be a very lengthy process.
 {¶ 33} As clearly set forth in the parties' 1998 contracts, plaintiff was required to construct, at its own expense, all of the lines, connections, and valves within the proposed developments. Plaintiff was also required to convey title to these improvements to JWSD prior to the time JWSD was obligated to begin servicing any portion of plaintiff's proposed developments. The agreements also provided that either party could void or terminate the contracts if plaintiff failed to acquire title and/or ownership of the property within two years of the date of the execution of the agreements. Finally, JWSD then brought to the trial court's attention that plaintiff had voluntarily sold the option it held to purchase the property in question well before the expiration of the two-year period set forth in the 1998 sewer tap agreements.
 {¶ 34} In response, plaintiff submitted an affidavit, sworn to by its president Mr. Dehlendorf, which stated merely, at paragraph 17, that "[a]fter signing the 1998 Agreements, I learned that JWSD would not be able to install the sewer lines to the Property within any reasonable time period." Plaintiff then proceeded to argue that summary judgment was improper because JWSD had anticipatorily breached the sewer tap agreements by not providing service by May 1998.
 {¶ 35} In support of this claim, plaintiff argued that JWSD had breached the agreements "almost as soon as it executed" the documents because, although plaintiff was ready to buy the property and purchase the sewer taps when the agreements were executed, JWSD had not at that time obtained all of the necessary approvals and had therefore not constructed the necessary connecting lines to service the property. In our view, however, plaintiff's argument is disingenuous.
 {¶ 36} Both the June and July 1998 agreements contain an integration clause which provides that the written agreement contains the entire agreement of the parties, and that it may not be modified orally, but only in writing signed by both parties. A review of the agreements shows them to be nearly identical in substance, the only difference being that the June agreement applied to the sale and purchase of 161 single-family sewer taps, while the July agreement applied to the sale and purchase of 108 single-family and 72 condominium sewer taps. Those agreements provided, as evidenced by identical language in each, that:
 {¶ 37} "2. Subject to availability, the District [JWSD] does hereby agree to sell to the Purchaser, and the Purchaser does hereby agree to purchase from the District, Taps * * * in accordance with the Purchase Schedule hereafter set forth. * * *
 {¶ 38} "3. * * * With respect to connection to the District's Sanitary Sewer System, the parties understand and agree that the District is only required to provide to Purchaser access to its System at a fixed and certain location, which location is identified as Point 1 on Exhibit `A' attached hereto and incorporated herein. Purchaser is required to construct or obtain at its own cost and expense, and in accordance with the Rules, Regulations and Specifications of the District, all mains, lines, meters, valves, fittings, equipment and other facilities located within each phase of Purchaser's development identified on Exhibit A, which are reasonably required in order for the District to provide sanitary sewer service within that phase of Purchaser's development * * *."
 {¶ 39} The agreements provided further that:
 {¶ 40} "The Purchaser or the District may terminate this Agreement upon the happening of any one or more of the following events:
 {¶ 41} "(a) The District ceases to provide sanitary sewer service to the Property in accordance with the System Requirements under circumstances in which it is unlikely that such sanitary sewer service will be recommenced within the foreseeable future * * *[.]
 {¶ 42} "(b) Purchaser is unable, within two (2) years of the execution of this Agreement, to acquire ownership of the said Property, or is unable to obtain final approval of construction drawings for the sanitary sewer and water lines within the subdivision from applicable governmental authorities with jurisdiction over the same.
 {¶ 43} "8. The District may terminate this Agreement upon the happening of any one or more of the following events:
 {¶ 44} "(a) The Purchaser fails, for whatever reason, to construct the necessary On-Site Improvements for Phase I servicing at least thirty (30) lots on the Property within two (2) years from the date of execution of this Agreement;
 {¶ 45} "(b) Default by Purchaser in any of the performance of any of its obligations under this Agreement. * * *
 {¶ 46} "(c) The District is unable to obtain all necessary governmental permits and approvals to construct any offsite facilities or oversized facilities which may be necessary to service the Property, and any other potential users of such systems."
 {¶ 47} Finally, the parties specifically agreed that the following was to occur prior to the initiation of service by JWSD:
 {¶ 48} "9. Prior to the time when the District begins to render sanitary sewer service to the Property, Purchaser shall convey to the District, without additional consideration from the District, all of the mains, lines, meters, valves, fittings, equipment and other facilities and easements which are reasonably required in order for [the] District to provide sanitary sewer service within the property * * *."
 {¶ 49} Having carefully reviewed the documents in question, in addition to the arguments presented by the parties, we find that the trial court properly concluded that JWSD had shown there to be no material issue of fact which would prevent summary judgment upon plaintiff's claim that JWSD breached the sewer tap agreements. In reaching this conclusion, our attention is drawn to another portion of Mr. Dehlendorf's deposition testimony, at which point he stated the following:
 {¶ 50} "Q. Did the — did Rockford proceed with this development while the appeal was still pending?
 {¶ 51} "A. Rockford has so much more clout with the City of Columbus—
 {¶ 52} "Q. Did they proceed—
 {¶ 53} "A. Yes.
 {¶ 54} "Q. — while it was pending?
 {¶ 55} "A. Yes.
 {¶ 56} "Q. So they were confronted with the same circumstances as you were, they decided to go forward; you decided you didn't want to take the risk.
 {¶ 57} "A. That's right.
 {¶ 58} "Q. Okay. And is that the District's fault, in your mind? Your business decision about the level of risk you want to take, is that — is that the fault of the District?
 {¶ 59} "A. That's not the fault of the District, nor is it the right of the District to tell me to ignore appeals made by the City of Columbus.
 {¶ 60} "* * *
 {¶ 61} "Q. Well, would you agree in hindsight that you probably made a wrong business decision with respect to giving up Morrison farms?
 {¶ 62} "A. Yes, I think I lost a lot of money by giving up Morrison farm." (Dehlendorf depo. at 222-224.)
 {¶ 63} Accordingly, plaintiff's second assignment of error is overruled.
 {¶ 64} In Count III of its complaint, plaintiff brings a claim for promissory estoppel, asserting that it relied to its detriment upon the July 1996 and May 1997 letters written by Mr. Fridley.
 {¶ 65} In a ruling issued on February 2002, the trial court found that these letters, when read separately, or when read together, did not contain any promissory language, and that plaintiff's reliance upon these letters was unreasonable. In its third assignment of error, plaintiff contends that this finding constitutes reversible error.
 {¶ 66} The doctrine of promissory estoppel holds that:
 {¶ 67} "`A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.'" McCroskey v. State (1983), 8 Ohio St.3d 29, 30, citing Restatement of the Law, Contracts 2d (1973), Section 90. Stated alternatively, "[a]n essential element of any action predicated upon promissory estoppel is the detrimental reliance of the promisee upon the false representations of the promisor." Karnes v. Doctors Hosp. (1990), 51 Ohio St.3d 139, 142.
 {¶ 68} In the context of liability suits against the state or subdivision thereof, the majority of the law touching upon this issue distinguishes whether the act in question was governmental or proprietary. That law provides that the doctrine of equitable estoppel is not applicable against a state, its agencies or political subdivisions, when those entities are engaged in a governmental function. Ohio State Bd. of Pharmacy v. Frantz (1990), 51 Ohio St.3d 143, 145-146. Government functions are those duties that are imposed upon the state or its subdivisions as obligations of sovereignty and include such duties as protection from crime, fires, or contagion, or preserving the peace and health of citizens and protecting their property. Ohio Dept. of Natl. Resources, Div. of Reclamation v. Hemlock Pipeline, Inc. (1991),77 Ohio App.3d 668, 670-671, citing Wooster v. Arbenz (1927),116 Ohio St. 281, 284-285. Enforcement of zoning laws is in the nature of a governmental function. Columbus v. Bazaar Mgmt., Inc. (Jan. 6, 1983), Franklin App. No. 82AP-33.
 {¶ 69} Specifically, R.C. 2744.01(C)(1) provides that a "governmental function" means a function of a political subdivision that is specified in division (C)(2) of this section or that satisfies any of the following:
 {¶ 70} "* * *
 {¶ 71} "(b) A function that is for the common good of all citizens of the state;
 {¶ 72} "* * *
 {¶ 73} "(2) A `governmental function' includes, but is not limited to, the following:
 {¶ 74} "* * *
 {¶ 75} "(k) The collection and disposal of solid wastes, as defined in section 3734.01 of the Revised Code, including, but not limited to, the operation of solid waste disposal facilities, as `facilities' is defined in that section, and the collection and management of hazardous waste generated by households. As used in division (C)(2)(k) of this section, `hazardous waste generated by households' means solid waste originally generated by individual households that is listed specifically as hazardous waste in or exhibits one or more characteristics of hazardous waste as defined by rules adopted under section 3734.12 of the Revised Code, but that is excluded from regulation as a hazardous waste by those rules.
 {¶ 76} "(l) The provision or nonprovision, planning or design, construction, or reconstruction of a public improvement, including, but not limited to, a sewer system."
 {¶ 77} On the other hand, a "proprietary function" means a function of a political subdivision that is specified in division R.C. 2744.01(G)(2) or that satisfies both of the following:
 {¶ 78} "(a) The function is not one described in division (C)(1)(a) or (b) of this section and is not one specified in division (C)(2) of this section;
 {¶ 79} "(b) The function is one that promotes or preserves the public peace, health, safety, or welfare and that involves activities that are customarily engaged in by nongovernmental persons.
 {¶ 80} "(2) A `proprietary function' includes, but is not limited to, the following:
 {¶ 81} "(a) The operation of a hospital by one or more political subdivisions;
 {¶ 82} "(b) The design, construction, reconstruction, renovation, repair, maintenance, and operation of a public cemetery other than a township cemetery;
 {¶ 83} "(c) The establishment, maintenance, and operation of a utility, including, but not limited to, a light, gas, power, or heat plant, a railroad, a busline or other transit company, an airport, and a municipal corporation water supply system;
 {¶ 84} "(d) The maintenance, destruction, operation, and upkeep of a sewer system;
 {¶ 85} "(e) The operation and control of a public stadium, auditorium, civic or social center, exhibition hall, arts and crafts center, band or orchestra, or off-street parking facility.
 {¶ 86} "(H) `State' means the state of Ohio, including, but not limited to, the general assembly, the supreme court, the offices of all elected state officers, and all departments, boards, offices, commissions, agencies, colleges and universities, institutions, and other instrumentalities of the state of Ohio. `State' does not include political subdivisions."
 {¶ 87} As noted, "* * * the principle of estoppel does not apply against a state or its agencies in the exercise of a governmental function." (Citations omitted.) Besl Corp. v. Pub. Util. Comm. (1976),45 Ohio St.2d 146, 150. Specifically, the Ohio Supreme Court held in State ex rel. Svete v. Bd. of Elections (1965), 4 Ohio St.2d 16, that even "[m]istaken advice or opinion of an agent of a governmental body as to the validity of an instrument does not create an estoppel against a public official to declare the instrument invalid." Id. at. 18.
 {¶ 88} Pursuant to State ex rel. Chevalier v. Brown (1985),17 Ohio St.3d 61; Ohio State Bd. of Pharmacy v. Frantz (1990),51 Ohio St.3d 143, and Drake Ctr., Inc. v. Ohio Dept. of Human Services (1998), 125 Ohio App.3d 678, we also conclude that the doctrine of promissory estoppel is inapplicable to these facts, as JWSD was clearly operating in a governmental function pursuant to R.C. 2744.01(C)(1)(b),2744.01(C)(2)(k), and 2744.01(C)(2)(i), and clearly was not conducting itself in a proprietary manner as set forth in R.C. 2744.01(G)(1)(a) and (b), or 2744.01(G)(2)(a) through (e).
 {¶ 89} Because JWSD was engaged in a governmental function, there is a long-settled principle that estoppel cannot be applied against it. See Ohio State Bd. of Pharmacy v. Frantz, supra; Sun Refining 
Marketing Corp. v. Brennan (1987), 31 Ohio St.3d 306; Griffith v. J.C. Penney Co. (1986), 24 Ohio St.3d 112; Besl Corp., supra; Davis v. Ohio Bur. of Employment Serv. (1988), 51 Ohio App.3d 87; Gaston v. Bd. of Review (1983), 17 Ohio App.3d 12. Accordingly, plaintiff's third assignment of error is overruled.
 {¶ 90} In its fourth and final assignment of error, plaintiff argues that JWSD committed a violation of R.C. 121.22, otherwise known as Ohio's "Sunshine Law." R.C. 121.22 governs the meetings of public bodies. Section (A) provides that "[t]his section shall be liberally construed to require public officials to take official action and to conduct all deliberations upon official business only in open meetings unless the subject matter is specifically excepted by law." Section (C) continues, declaring that "[a]ll meetings of any public body are declared to be public meetings open to the public at all times. A member of a public body shall be present in person at a meeting open to the public to be considered present or to vote at the meeting and for purposes of determining whether a quorum is present at the meeting."
 {¶ 91} In this case, plaintiff maintains that JWSD impermissibly held executive sessions during public meetings held on May 18 and July 6, 2000, in order to discuss plaintiff's lawsuit. Specifically, plaintiff alleges that JWSD violated R.C. 121.22(G)(1), which provides as follows:
 {¶ 92} "(G) Except as provided in division (J) of this section, the members of a public body may hold an executive session only after a majority of a quorum of the public body determines, by a roll call vote, to hold an executive session and only at a regular or special meeting for the sole purpose of the consideration of any of the following matters:
 {¶ 93} "(1) To consider the appointment, employment, dismissal, discipline, promotion, demotion, or compensation of a public employee or official, or the investigation of charges or complaints against a public employee, official, licensee, or regulated individual, unless the public employee, official, licensee, or regulated individual requests a public hearing. * * * If a public body holds an executive session pursuant to division (G)(1) of this section, the motion and vote to hold that executive session shall state which one or more of the approved purposes listed in division (G)(1) of this section are the purposes for which the executive session is to be held, but need not include the name of any person to be considered at the meeting.
 {¶ 94} "(2) To consider the purchase of property for public purposes, or for the sale of property at competitive bidding * * *[;]
 {¶ 95} "(3) Conferences with an attorney for the public body concerning disputes involving the public body that are the subject of pending or imminent court action;
 {¶ 96} "* * *
 {¶ 97} "If a public body holds an executive session to consider any of the matters listed in divisions (G)(2) to (7) of this section, the motion and vote to hold that executive session shall state which one or more of the approved matters listed in those divisions are to be considered at the executive session.
 {¶ 98} "* * *
 {¶ 99} "(I)(1) Any person may bring an action to enforce this section. An action under division (I)(1) of this section shall be brought within two years after the date of the alleged violation or threatened violation. Upon proof of a violation or threatened violation of this section in an action brought by any person, the court of common pleas shall issue an injunction to compel the members of the public body to comply with its provisions."
 {¶ 100} After carefully reviewing the arguments set forth in plaintiff's appellate briefs, the only argument which we find potentially meritorious is plaintiff's claim that JWSD was not allowed to hold executive sessions to discuss plaintiff's lawsuit because there was no attorney present during either of the challenged meetings.
 {¶ 101} However, after examining JWSD's motion for summary judgment as well as the record of this proceeding, we conclude that plaintiff was required to come forward with specific facts or evidence to support its claim that JWSD did in fact discuss this litigation during either the May 18 or July 6, 2000 meetings. Yet, our review reveals that plaintiff failed to do so. Admittedly, plaintiff moved the trial court to compel JWSD to produce the records of the executive sessions, which might have enabled plaintiff to demonstrate that JWSD did, in fact, discuss the pending litigation, thus invoking R.C. 121.22(G)(3); however, the trial court did not rule upon that motion, and plaintiff pursued it no further.
 {¶ 102} When a court fails to rule upon a motion such as plaintiff's motion to compel, the motion is generally deemed to have been overruled. State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn. (1994), 69 Ohio St.3d 217, 223; see, also, Stover v. Wallace (Feb. 15, 1996), Franklin App. No. 95AP-743. In this case, there is no indication that the trial court ruled upon plaintiff's motion to compel, nor did plaintiff appeal the trial court's "decision" to overrule its motion. Accordingly, we conclude that plaintiff has failed to produce admissible evidence which would demonstrate that a material issue of fact exists upon the cause of action set forth by plaintiff in the fourth count of its complaint. Plaintiff's fourth assignment of error is overruled.
 {¶ 103} Having overruled all four of plaintiff's assignments of error, we hereby affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
TYACK and BRYANT, JJ., concur.
[1] Plaintiff does not appeal the order dismissing Jefferson Township or the individual defendants named in the complaint.